**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| RAMON RODRIGUEZ VAZQUEZ, on behalf of himself as an individual and on behalf of others similarly situated, | No. 25-6842 D.C. No. 3:25-cv-05240-TMC |
| *Plaintiff - Appellee*, | |
| v. | OPINION |
| DREW BOSTOCK, Seattle Field Office Director, Enforcement and Removal Operations, United States Immigration and Customs Enforcement (ICE); BRUCE SCOTT, Warden, Northwest ICE Processing Center; MARKWAYNE MULLIN, Secretary, United States Department of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TODD BLANCHE, Acting Attorney General; EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, (EOIR); SIRCE OWEN, Acting Director, EOIR; TACOMA IMMIGRATION COURT, | |
| *Defendants - Appellants*. | |

Appeal from the United States District Court
for the Western District of Washington
Tiffany M. Cartwright, District Judge, Presiding

Argued and Submitted March 4, 2026
Seattle, Washington

Filed July 30, 2026

Before: M. Margaret McKeown, Carlos T. Bea, and Daniel
A. Bress, Circuit Judges.

Opinion by Judge Bress;
Dissent by Judge Bea

## SUMMARY[*]

### Immigration

Affirming the district court's grant of summary judgment in favor of a class of detained aliens in Western Washington, the panel held that aliens present without admission who are apprehended in the interior of the United States are not subject to mandatory detention under 8 U.S.C. § 1225(b)(2)(A).

The panel explained that, historically, the law regarded unadmitted aliens present in the interior of the United States as subject to release on bond during their removal

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

proceedings. That understanding persisted after the amendments Congress made to the Immigration and Nationality Act (INA) with the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). Following those amendments, the government treated unadmitted aliens present in the interior as detained under 8 U.S.C. § 1226(a), which allows for release on bond. Section 1225(b)(2)(A), requiring mandatory detention, was understood to apply only to aliens seeking to enter the United States at the border.

In July 2025, the government issued guidance providing that unadmitted aliens present in the interior of the country were subject to mandatory detention under § 1225(b)(2)(A). The change resulted in thousands of aliens filing habeas petitions seeking bond hearings and possible release. The panel observed that the Fifth and Eighth Circuits have sided with the government (each over a dissent), while the Second, Sixth, Tenth, and Eleventh Circuits have sided with the habeas petitioners (the Sixth and Eleventh with dissents), and the Seventh Circuit has issued a decision that failed to command a majority.

Subject to carveouts not applicable here, § 1225(b)(2)(A) provides that "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained" during immigration proceedings. Section 1225(a)(1), also added by IIRIRA, provides that an "alien present in the United States who has not been admitted . . . shall be deemed for purposes of this chapter an applicant for admission."

The panel concluded that § 1225(b)(2)(A), based on its text and context, is best construed as applying to aliens entering at the border. The word "admission" under the INA is specifically defined as "the lawful entry . . . into the United States after inspection and authorization." 8 U.S.C. § 1101(a)(13)(A). Combined with the word "seeking," § 1225(b)(2)(A) has been treated as requiring that an alien be engaged in the affirmative process of attempting to gain "entry" "into" the country, which an alien does at the border (or a port of entry). The panel wrote that this interpretation avoids surplusage, accords with the ordinary understanding of "seeking," coheres with the statute's reference to an "examining immigration officer," and is consistent with the Supreme Court's description of the detention regime in *Jennings v. Rodriguez*, 583 U.S. 281 (2018).

The government's interpretation is that all aliens present in the United States without admission are subject to § 1225(b)(2)(A) because, in its view, an "applicant for admission" is necessarily "seeking admission." The panel explained that this reading results in surplusage, is inconsistent with ordinary language usage, and is in significant tension, if not outright conflict, with *Torres v. Barr*, 976 F.3d 918 (9th Cir. 2020) (en banc). The other provisions in § 1225 likewise did not advance the government's position.

The panel also observed that, if the statute is meant to require the mass detention of unadmitted aliens present in the United States and mark a sharp break from the past, Congress would not have introduced such a major change through a cross-referenced deeming provision, in the way the government asserts. The oblique and elliptical language of § 1225(b)(2)(A) does not approach the requisite clarity expected if Congress wished to alter the fundamental details

of the mandatory detention scheme. Section 1226 also continues to confirm that the government is seeking to invoke a significant power on an uncertain statutory basis.

Moreover, the panel concluded that the government's reliance on the posited statutory purpose of IIRIRA—equalizing the treatment of aliens who enter the country illegally and those who present themselves for lawful inspection at the border—was not conclusive enough to overcome the textual difficulties associated with the government's new interpretation. Finally, the panel concluded that the post-enactment practice and understanding surrounding IIRIRA's detention authorities detracted from the government's new interpretation. That no Administration has ever found a duty mandatorily to detain unadmitted aliens present in the interior of the country is strong evidence that it does not exist.

Dissenting, Judge Bea would hold that the government was correct that all those deemed to be "applicants for admission," are necessarily "seeking admission," and thus are subject to subject to mandatory detention under § 1225(b)(2)(A). Judge Bea arrived at this conclusion by accepting that Congress deemed an alien present in the United States who has not been admitted, an "applicant for admission," § 1225(a)(1); applying a non-specialized, ordinary meaning to the undefined terms, "applicant for admission" and "seeking admission;" and asking whether an applicant for admission is someone who is seeking admission. Judge Bea wrote that the other provisions of § 1225 provide yet further proof that an "applicant for admission" is "seeking admission."

Judge Bea also concluded that this straightforward textual interpretation meshes with the purpose of IIRIRA,

while the majority's interpretation undermines that purpose. Judge Bea also rejected the majority's reliance on other considerations, including its pervasive, underlying demand for an untold level of congressional clarity.

## COUNSEL

Matt Adams (argued), Aaron Korthuis, Amanda Ng, Leila Kang, and Glenda M.A. Madrid, Northwest Immigrant Rights Project, Seattle, Washington; My Khanh Ngo, Oscar S. Roman, and Michael K.T. Tan, American Civil Liberties Union Foundation, San Francisco, California; Judy Rabinovitz and Natalie Behr, American Civil Liberties Union Foundation, New York, New York; for Plaintiff-Appellee.

Benjamin T. Hayes (argued), Senior Counsel to the Assistant Attorney General; Ian S. Lam, Michael D. Ross, and Jaime Durr, Trial Attorneys, Office of Immigration Litigation; Samuel P. Go and Victor M. Mercado-Santana, Senior Litigation Counsel; Elizabeth Hedges, Counsel to the Assistant Attorney General; Drew C. Ensign, Deputy Assistant Attorney General; Yaakov M. Roth, Principal Deputy Assistant Attorney General; Brett A. Shumate, Assistant Attorney General; Civil Division; United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Amit Jain and Kathleen Pleiss, Roderick & Solange MacArthur Justice Center, Washington, D.C., for Amici Curiae Immigration Law Scholars.

Suchita Mathur, Rebecca M. Cassler, and Emma C. Winger, American Immigration Council, Washington, D.C., for Amici Curiae American Immigration Council and American Immigration Lawyers Association.

Julie Dona, Special Counsel; Gillian Barna, Assistant Solicitor General; Philip J. Levitz, Senior Assistant Solicitor General; Barbara D. Underwood, Solicitor General; Letitia James, New York Attorney General; Office of the New York Attorney General, New York, New York; Robin Goldfaden, Deputy Solicitor General; Marissa Malouff, Supervising Deputy Attorney General; Rob Bonta, California Attorney General; Office of the California Attorney General, San Francisco, California; Kristin K. Mayes, Arizona Attorney General, Office of the Arizona Attorney General, Phoenix, Arizona; Kwame Raoul, Illinois Attorney General, Office of the Illinois Attorney General, Chicago, Illinois; Philip J. Weiser, Colorado Attorney General, Office of the Colorado Attorney General, Denver, Colorado; Aaron M. Frey, Maine Attorney General, Office of the Maine Attorney General, Augusta, Maine; William Tong, Connecticut Attorney General, Office of the Connecticut Attorney General, Hartford, Connecticut; Anthony G. Brown, Maryland Attorney General, Office of the Maryland Attorney General, Baltimore, Maryland; Kathleen Jennings, Delaware Attorney General, Office of the Delaware Attorney General, Wilmington, Delaware; Andrea J. Campbell, Massachusetts Attorney General, Office of the Massachusetts Attorney General, Boston, Massachusetts; Brian L. Schwalb, District of Columbia Attorney General, Office of the District of Columbia Attorney General, Washington, D.C.; Dana Nessel, Michigan Attorney General, Office of the Michigan Attorney General, Lansing, Michigan; Anne E. Lopez, Hawai'i Attorney General, Office of the Hawai'i Attorney

General, Honolulu, Hawai'i; Keith Ellison, Minnesota Attorney General, Office of the Minnesota Attorney General, St. Paul, Minnesota; Aaron D. Ford, Nevada Attorney General, Office of the Nevada Attorney General, Carson City, Nevada; Peter F. Neronha, Rhode Island Attorney General, Office of the Rhode Island Attorney General, Providence, Rhode Island; Jennifer Davenport, New Jersey Acting Attorney General, Office of the New Jersey Attorney General, Trenton, New Jersey; Charity R. Clark, Vermont Attorney General, Office of the Vermont Attorney General, Montpelier, Vermont; Dan Rayfield, Oregon Attorney General, Office of the Oregon Attorney General, Salem, Oregon;

Nicholas W. Brown, Washington Attorney General, Office of the Washington Attorney General, Olympia, Washington; for Amici Curiae New York, California, Arizona, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, Oregon, Rhode Island, Vermont, Washington, and the District of Columbia.

David H. Fry, Munger Tolles & Olson LLP, San Francisco, California; Nicole R. Allicock, Munger Tolles & Olson LLP, Washington, D.C.; Liam McGivern and Regan Bailey, Justice in Aging, Washington, D.C.; for Amici Curiae Justice in Aging, Northwest Health Law Advocates, and National Immigration Law Center.

Jordan Wells, Lawyers' Committee for Civil Rights of the San Francisco Bay Area, San Francisco, California, for Amicus Curiae Lawyers' Committee for Civil Rights of the San Francisco Bay Area.

# OPINION

BRESS, Circuit Judge:

Historically, the law regarded unadmitted aliens present in the interior of the United States as subject to release on bond during the pendency of their removal proceedings. That understanding persisted after the 1996 amendments to the Immigration and Nationality Act (INA). Following those amendments, and over the course of many Presidential administrations, the government treated these unadmitted aliens present in the interior of the United States as detained pursuant to 8 U.S.C. § 1226, which allows for release on bond. A different provision requiring mandatory detention, 8 U.S.C. § 1225(b)(2)(A), was understood to apply only to aliens who were seeking to enter the United States at the border.

The government recently changed its longstanding approach. It now contends that unadmitted aliens present in the interior of the country are subject to mandatory detention without bond under § 1225(b)(2)(A), based on revisions to the statute that Congress made in 1996. The government's change in policy has resulted in detained aliens filing thousands of habeas petitions in federal courts across the country, seeking bond hearings and possible release from detention. Some of these detained aliens have resided in the United States for lengthy periods. The implication of the government's position is that Congress in 1996 made a major change to the immigration laws by subjecting millions of unadmitted aliens present in the United States to mandatory detention, but that this change then went unnoticed and unheeded, with the Executive Branch for the next three decades violating Congress's assertedly

unambiguous mandatory detention directive by treating these aliens as subject to release on bond.

We conclude that the text, context, and structure of the INA, considered as a whole, did not direct such a significant, yet overlooked, change in the law. Although no reading of the complicated and interrelated textual provisions at issue here is without some shortcomings, the historical understanding of the statute is the better one. The government's new interpretation, by contrast, is less consistent with the statutory text and introduces a series of interpretative complications. We accordingly do not think that Congress in 1996 made such a large-scale change to our established system of immigration detention in the way that the government now contends.

The aliens at issue here remain subject to mandatory detention if they commit qualifying criminal offenses, and they may be denied bond and held pending their removal proceedings if they pose flight risks or dangers to the community. Whether these aliens should be subject to a broader mandatory detention regime is a policy question that lies outside the role of the judiciary. The question here is not about policy or Executive Branch discretion, but congressional authorization. We do not decide whether Congress could enact the detention regime as the government would now have it, but rather whether Congress did so in 1996. The better view is that it did not.

For the reasons that follow, we conclude that aliens present without admission who are apprehended in the interior of the United States are subject to the detention regime of § 1226, not § 1225(b)(2)(A). The judgment of the district court is affirmed.

I

A

Civil detention of aliens at the federal level began at the close of the nineteenth century, during a period when Congress was consolidating federal control over the nation's immigration policies. *See Hernandez Alvarez v. Warden*, 175 F.4th 1258, 1281 (11th Cir. 2026) ("[N]ear the close of the nineteenth century, Congress expanded border agents' powers to specifically detain arriving aliens pending review." (emphasis omitted)). It appears that the first congressional statute authorizing mandatory detention required that "every inspector of arriving alien immigrants . . . detain for a special inquiry" any alien not "clearly and beyond doubt entitled to admission." Immigration Act of 1893, ch. 206, § 5, 27 Stat. 569, 570 (1893); *see Hernandez Alvarez*, 175 F.4th at 1281. Ten years later, Congress passed the Immigration Act of 1903, Pub. L. No. 57-162, § 24, 32 Stat. 1213, 1219–20 (1903), which similarly provided that "[e]very alien who may not appear to the examining immigrant inspector at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for examination in relation thereto by a board of special inquiry." *See Hernandez Alvarez*, 175 F.4th at 1281. Similar language was included in the INA in 1952. *See* Pub. L. No. 82-414, § 235(b), 66 Stat. 163, 199.

In the meantime, Congress authorized, but did not mandate, the detention of certain aliens inside the country "upon [a] warrant," pending the alien's removal. *See* Act of Feb. 5, 1917, ch. 29, §§ 19–20, 39 Stat. 874, 889–91 (1917) (providing that such aliens "may be released under a bond"). When mandatory detention was provided for in the early laws, Congress limited that authority to "'arriving alien

immigrants,' aliens 'at the port of arrival,' and 'aliens[s] seeking entry.'" *Hernandez Alvarez*, 175 F.4th at 1281.

This system—where arriving aliens suspected of inadmissibility were subject to mandatory detention at the ports of arrival, and aliens inside the country were subject only to discretionary detention with the possibility of bond— was carried over into the INA. *See* 66 Stat. at 199, 208–09. Initially under the INA, aliens detained at the border during entry into the United States were subject to "exclusion" proceedings, whereas aliens physically (though unlawfully) present in the United States were subject to "deportation" proceedings. *See Landon v. Plasencia*, 459 U.S. 21, 25 (1982); *Torres v. Barr*, 976 F.3d 918, 927 (9th Cir. 2020) (en banc); *Hose v. I.N.S.*, 180 F.3d 992, 994 (9th Cir. 1999) (en banc).

Under this regime, the "distinction between those who had entered the United States and those who had not was important," in that "'non-citizens [aliens] who had entered without inspection could take advantage of the greater procedural and substantive rights afforded in deportation proceedings, while non-citizens who presented themselves at a port of entry for inspection were subjected to more summary exclusion proceedings.'" *Torres*, 976 F.3d at 927– 28 (quoting *Hing Sum v. Holder*, 602 F.3d 1092, 1100 (9th Cir. 2010)); *see also Plasencia*, 459 U.S. at 25–27 (summarizing the differences between deportation and exclusion proceedings). We have explained that these rights for aliens already present in the United States included the ability to seek adjustment of status, request suspension of deportation, voluntarily depart, and have the burden of proof placed on the government. *See Maldonado-Sandoval v. INS*, 518 F.2d 278, 280 n.3 (9th Cir. 1975) (per curiam). Aliens in deportation proceedings could also receive release on

bond, whereas those subject to exclusion proceedings at the border were mandatorily detained. *See* 8 U.S.C. §§ 1225(a)–(b) (1995), 1252(a) (1994); *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216, 223 (BIA 2025).  Over time, Congress mandated the detention of limited categories of aliens inside the United States who had committed certain crimes. *See, e.g.*, Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7343(a)(4), 12 Stat. 4181, 4470 (1988).

Congress next passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009-546 (1996).  Among other changes, IIRIRA eliminated the distinction between deportation and exclusion proceedings and replaced them with a general "removal" proceeding, to which all aliens would be subject. *See* 8 U.S.C. § 1229a; *Yajure Hurtado*, 29 I. & N. Dec. at 223.  Relying on legislative history, we have said that, through this change, Congress sought to correct the "anomaly" by which those aliens attempting to enter lawfully were subject to less favorable removal proceedings, thereby "ensur[ing] that all immigrants who have not been lawfully admitted, regardless of their physical presence in the country, are placed on equal footing in removal proceedings under the INA." *Torres*, 976 F.3d at 928 (citing H.R. Rep. No. 104-469, pt. 1, at 225 (1996)).

One of the additional ways that Congress accomplished this is through IIRIRA's "deeming" provision, which "deem[s]" as an "applicant for admission" any "alien present in the United States who has not been admitted or who arrives in the United States."  8 U.S.C. § 1225(a)(1). Because this provision deems unadmitted aliens who are already present here as "applicants for admission," we have described the phrase "applicant for admission" in § 1225(a)(1) as a "term of art denoting a particular legal

14          RODRIGUEZ VAZQUEZ V. BOSTOCK

status," which "places some physically-but-not-lawfully present noncitizens into a fictive legal status for purposes of removal proceedings." *Torres*, 976 F.3d at 927–28.

This statutory innovation has important consequences in removal proceedings. Per the above discussion, by deeming unadmitted aliens present inside the United States "applicants for admission," § 1225(a)(1) brings those aliens within the INA's inadmissibility framework and its associated procedural burdens. As compared to persons who are lawfully admitted yet removable, *i.e.*, deportable, aliens who are "applicants for admission" (both present and arriving) are treated less favorably in removal proceedings. That is because inadmissibility grounds are distinct and often broader than those for deportability, and an alien charged with inadmissibility bears the burden of proof in removal proceedings. *Judulang v. Holder*, 565 U.S. 42, 46 (2011); *Barton v. Barr*, 590 U.S. 222, 243 (2020) (Sotomayor, J., dissenting); *see also Ortega-Lopez v. Barr*, 978 F.3d 680, 682 (9th Cir. 2020) ("Under [IIRIRA], a person who physically entered the United States but was not admitted is subject to grounds of inadmissibility, rather than deportability, and has to bear the corresponding burden of proving admissibility."); 8 U.S.C. § 1229a(c)(2)(A).

IIRIRA also amended the INA's detention provisions. Section 1226 sets out a general detention scheme for aliens charged with removability. *See* 8 U.S.C. § 1226. It provides that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." *Id.* § 1226(a); *see also* 6 U.S.C. §§ 251, 557 & 8 U.S.C. § 1101(a)(1) (transferring immigration enforcement from the Attorney General to the Department of Homeland Security (DHS)). Section 1226 refers generally to "alien[s],"

without limitation. Because § 1226 is not limited to aliens deemed "applicants for admission," the aliens subject to § 1226 include other aliens, such as admitted aliens "who overstay or violate the terms of their visas" or who "engage in conduct that renders them removable." *Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 499 (5th Cir. 2026).

Like the previous detention authorities governing unadmitted aliens apprehended in the interior, detention under § 1226(a) is discretionary, allowing the release of aliens on bond pending their removal proceedings. 8 U.S.C. § 1226(a)(2); 8 C.F.R. §§ 1003.19, 1236.1; *see Jennings v. Rodriguez*, 583 U.S. 281, 303 (2018) ("Section 1226(a) creates a default rule for those aliens by permitting—but not requiring—the Attorney General to issue warrants for their arrest . . . . Section 1226(a) also permits the Attorney General to release those aliens on bond."). Although DHS makes the initial custody determination, aliens subject to § 1226(a) can seek bond hearings before an immigration judge (IJ) and further review in the Board of Immigration Appeals (BIA). 8 C.F.R. §§ 236.1(c)(8), (d), 1236.1(d)(1), (3), 1003.19. A § 1226(a) detainee will be released on bond if he demonstrates by a preponderance of the evidence that he is not a flight risk or a danger to the community. *See Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1197 (9th Cir. 2022) (citing *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006)).

Section 1226(c) creates certain exceptions to the default availability of bond under § 1226(a). *See Nielsen v. Preap*, 586 U.S. 392, 409 (2019) (observing that § 1226(c) is "a limit on the authority conferred by subsection (a)"). Building off and expanding the pre-IIRIRA statutory provisions, under § 1226(c), aliens who have committed certain crimes or who present national security concerns are

subject to mandatory detention and cannot be released on bond. 8 U.S.C. § 1226(c)(1)(A)–(E), (4); *see also Rodriguez Diaz*, 53 F.4th at 1197. Given § 1226(c)'s expansion of mandatory detention, Congress in 1996 gave the Executive Branch the discretion to delay implementation of this provision to give the agency time to build detention capacity during the statutory transition. *See* IIRIRA § 303(b)(2), 110 Stat. at 3009–586. In addition, IIRIRA directed the Attorney General to increase the detention facilities of the INS to at least 9,000 beds before the end of 1997. *Id.* § 386, 110 Stat. at 3009–653. The INS promptly invoked its authority to delay implementation of mandatory detention under § 1226(c). *See* Letter from Doris Meissner, Comm'r, INS, to Henry J. Hyde, Chairman, S. Comm. on the Judiciary (Oct. 3, 1997); *Hernandez Alvarez*, 175 F.4th at 1283; *Barbosa da Cunha v. Freden*, 175 F.4th 61, 89–90 (2d Cir. 2026).

Congress amended § 1226(c) again in 2025 in the Laken Riley Act, expanding the range of circumstances and criminal violations that will render an alien subject to mandatory detention and ineligible for bond under § 1226(a). *See* Pub. L. No. 119-1, § 2, 139 Stat. 3, 3 (2025) (codified in relevant part at 8 U.S.C. § 1226(c)(1)(E)). Section 1226(c)(1)(E) now requires the mandatory detention of aliens inadmissible under § 1182(a)(6)(A) (presence without admission), § 1182(a)(6)(C) (misrepresentation to procure admission into the United States), and § 1182(a)(7) (lack of documentation), who *also* commit various enumerated crimes. 8 U.S.C. § 1226(c)(1)(E). Accordingly, aliens who enter the United States illegally and then commit one of the crimes enumerated in § 1226(c)(1)(E) are subject to mandatory detention under that provision. This provision

applies to aliens who are present in the interior of the United States without admission.

The other set of detention authorities at issue in this case are housed in 8 U.S.C. § 1225. That section is entitled "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing." As discussed above, § 1225 begins with the provision "deem[ing]" as "applicant[s] for admission" both aliens present in the United States without admission and those arriving in the United States. *Id.* § 1225(a)(1). Section 1225 also includes the INA's inspection mandate. *Id.* § 1225(a)(3) ("All aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers."). Section 1225 then establishes two independent pathways for processing aliens suspected of inadmissibility and detaining them pending those proceedings:

First, § 1225(b)(1) sets out IIRIRA's new expedited removal regime. *See DHS v. Thuraissigiam*, 591 U.S. 103, 109 (2020) (discussing expedited removal). Under the expedited removal provisions, aliens arriving in the United States (and at the Attorney General's discretion, aliens with fewer than two years of continuous presence in the United States) are subject to summary removal proceedings when they are inadmissible for lacking valid entry documents or engaging in various forms of immigration fraud. 8 U.S.C. § 1225(b)(1)(A)(i) (applying to aliens "arriving in the United States"); *id.* § 1225(b)(1)(A)(iii) (applying to an alien "who has not affirmatively shown . . . that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility"). Aliens subject to

expedited removal shall be ordered removed without further hearing or review, unless they express a credible fear of persecution, in which case they are referred for further proceedings. *Id.* § 1225(b)(1)(A), (B). Aliens in expedited removal proceedings are mandatorily detained pending their removal and credible fear proceedings. *Id.* § 1225(b)(1)(B)(ii), (iii)(IV); *see also Jennings*, 583 U.S. at 297 (noting that § 1225(b)(1) does not "say[] anything whatsoever about bond hearings"); 8 C.F.R. § 235.3(b)(2)(iii).

Second, § 1225(b)(2) requires the detention of certain "other aliens" pending removal proceedings. Section 1225(b)(2)(A), the key provision in this case, reads as follows:

> Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

The carve-out for subparagraph (B) excepts from § 1225(b)(2)(A) aliens who are crewmen, stowaways, or who are subject to expedited removal under § 1225(b)(1). *Id.* § 1225(b)(2)(B). The carve-out for subparagraph (C) allows the government to return arriving aliens to contiguous foreign territory before their removal proceedings. *Id.* § 1225(b)(2)(C). The final reference to "section 1229a of this title" is to the removal proceedings themselves. *See id.* § 1229a.

Unlike with detention under § 1226, detention under both § 1225(b)(1) and (2) is mandatory and affords no opportunity for release on bond. *See Jennings*, 583 U.S. at 300 (explaining that these provisions "unequivocally mandate that aliens falling within their scope 'shall' be detained"); *see also Buenrostro-Mendez*, 166 F.4th at 499 ("Section 1225(b)(2) does not include any exception that permits the government to release detained aliens on bond."). However, as noted above, for aliens subject to § 1225(b)(2)(A), and in the case of an alien "who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory" pending his removal proceedings. 8 U.S.C. § 1225(b)(2)(C). The government may also grant temporary parole to aliens subject to § 1225(b)(2)(A), but "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *Id.* § 1182(d)(5)(A).

In *Jennings v. Rodriguez*, 583 U.S. 281 (2018), the Supreme Court discussed §§ 1225 and 1226. Referencing § 1225, *Jennings* explained that the process of evaluating an alien's right to enter and remain in the United States "generally begins at the Nation's borders and ports of entry, where the Government must determine whether an alien seeking to enter the country is admissible." *Id.* at 287. The Court noted that "§ 1225(b) applies primarily to aliens seeking entry into the United States." *Id.* at 297. The Court further stated that "§ 1226 applies to aliens already present in the United States." *Id.* at 303. Discussing both §§ 1225 and 1226 together, the Court wrote that "U.S. immigration law authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain

aliens already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c)." *Id.* at 289.

This language in *Jennings* indicates that the Supreme Court was evidently operating on the same understanding of §§ 1225 and 1226 that has prevailed since 1996 (and earlier, under the predecessor provisions), namely, that § 1225(b)(2)(A) applies to unadmitted aliens seeking entry into the United States at the border, whereas § 1226 applies to aliens already present in the United States. Until recently, the Executive Branch's actions in the thirty years since were consistent with that same understanding.

B

The plaintiffs in this case are a class of unadmitted aliens apprehended in the interior of the United States who are not subject to expedited removal under 8 U.S.C. § 1225(b)(1) or mandatory detention as criminal aliens under 8 U.S.C. § 1226(c). The dispute in this case is whether these plaintiffs are subject to mandatory detention under § 1225(b)(2)(A), or discretionary detention under § 1226(a) with a corresponding entitlement to a bond hearing. As we have noted, prior to its recent change in policy, the government treated aliens in the plaintiffs' position as subject to discretionary detention under § 1226(a). That includes the last thirty years, following Congress's amendment of § 1225(b)(2)(A) to add the language that the government now claims requires mandatory detention. *See Barbosa da Cunha*, 175 F.4th at 91–92.

The government's new interpretation of § 1225(b)(2)(A) seems to have originated from the practice of certain immigration judges in Tacoma, Washington, beginning in 2022, of denying bond to unadmitted aliens present inside the country, on the theory that § 1225(b)(2)(A) mandates

their detention.  Those immigration judges were initially rebuffed by the Board of Immigration Appeals (BIA), which in several unpublished decisions remanded cases to these immigration judges.  In one of those decisions, the BIA stated it was "unaware of any precedent stating that an Immigration Judge lacks authority to redetermine the custody conditions of a respondent in removal proceedings under the circumstances here."

In July 2025, the government reversed course. Immigration and Customs Enforcement (ICE) issued guidance determining that, "[e]ffective immediately," "[t]he only aliens eligible for a custody determination and release on . . . bond" under § 1226(a) are "aliens admitted to the United States" who have become deportable and who are not otherwise subject to § 1226(c).  ICE's guidance further provides that aliens who have entered without inspection are instead "subject to detention under [§ 1225(b)(2)(A)] and may not be released from ICE custody except by . . . parole." In September 2025, the Board of Immigration Appeals adopted this interpretation of the INA in *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (BIA 2025).

After the government began to detain unadmitted aliens present in the United States under § 1225(b)(2)(A), thousands of aliens filed habeas petitions seeking release from custody and bond determinations.  This is one such case.  Plaintiff Ramon Rodriguez Vazquez illegally entered the United States in 2009, without admission or parole.  In 2025, Rodriguez Vazquez was apprehended by immigration authorities pursuant to a warrant and placed in removal proceedings.  An immigration judge in Tacoma, Washington then denied Rodriguez Vazquez bond under the challenged interpretation of § 1225(b)(2)(A).

In response, Rodriguez Vazquez filed a habeas petition and class action complaint in federal district court. The district court certified a "Bond Denial Class" consisting of all individuals detained in the Northwest ICE Processing Center in Tacoma, Washington, and subject to mandatory detention under the government's § 1225(b)(2)(A) detention policy. *See, e.g.*, *Al Otro Lado v. EOIR*, 138 F.4th 1102, 1123–24 (9th Cir. 2025) (explaining that under Ninth Circuit precedent, 8 U.S.C. § 1252(f)(1) "does not 'bar classwide declaratory relief'" (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1119 (9th Cir. 2010))), *rev'd on other grounds sub nom. Mullin v. Al Otro Lado*, No. 25-5, 2026 WL 1825741 (U.S. June 25, 2026). The district court also granted the Bond Denial Class's motion for partial summary judgment and entered final judgment, holding that the class was not subject to mandatory detention under § 1225(b)(2)(A). Rodriguez Vazquez received a bond hearing, but he was denied bond. He chose voluntarily to depart the United States instead of further challenging his detention and removal.

Versions of this case have played out in federal courts across the country. The vast majority of the district courts to confront the issue have concluded that § 1225(b)(2)(A) is limited to the border and does not apply to unadmitted aliens apprehended inside the United States, meaning that those aliens are entitled to bond hearings under § 1226(a) and its implementing regulations. *See Barco Mercado v. Francis*, 811 F. Supp. 3d 487, 494 n.22 (S.D.N.Y. 2025) (collecting cases); *see also Barbosa da Cunha*, 175 F.4th at 71–72 (noting that "over ninety percent of district court judges have sided with Petitioner"). Some district courts, though, have ruled for the government. *See, e.g.*, *Lopez v. Dir. of Enf't & Removal Operations*, 817 F. Supp. 3d 1260, 1272 (M.D. Fla.

2026); *Chen v. Almodovar*, 2026 WL 100761, at \*13 (S.D.N.Y. Jan. 14, 2026); *Garibay-Robledo v. Noem,* 814 F. Supp. 3d 747, 758–59 (N.D. Tex. 2026); *Hernandez Cruz v. Noem*, 2025 WL 3482630, at \*4 (C.D. Cal. Dec. 2, 2025).

The circuits are divided as well. In February of this year, the Fifth Circuit became the first court of appeals to address the question on the merits. *See Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026). In *Buenrostro-Mendez*, and over a dissent, the Fifth Circuit sided with the government, holding that § 1225(b)(2)(A) applies to unadmitted aliens inside the country and requires their detention without the possibility of bond. *Id.* at 498. The Eighth Circuit agreed with the Fifth Circuit, also over a dissent. *See Avila v. Bondi*, 170 F.4th 1128, 1138 (8th Cir. 2026).

The Second, Sixth, Tenth, and Eleventh Circuits (the Sixth and Eleventh with dissents) subsequently sided with the habeas petitioners, holding that § 1225(b)(2)(A) does not apply to unadmitted aliens apprehended in the interior. *See Barbosa da Cunha v. Freden*, 175 F.4th 61, 71 (2d Cir. 2026); *Lopez-Campos v. Raycraft*, 175 F.4th 713, 732 (6th Cir. 2026); *Santillan Quiroz v. Mullin*, 2026 WL 1876709, at \*5 (10th Cir. June 30, 2026); *Hernandez Alvarez v. Warden*, 175 F.4th 1258, 1262 (11th Cir. 2026). After earlier concluding at the stay motion stage that the government was unlikely to prevail on the merits of the § 1225(b)(2)(A) issue, *see Castañon-Nava v. DHS*, 161 F.4th 1048, 1061 (7th Cir. 2025), the Seventh Circuit issued a splintered decision that failed to command a majority on this issue, although the bottom-line result was that the plaintiffs prevailed. *See Castañon-Nava v. DHS*, 175 F.4th 828, 857–58 (7th Cir. 2026).

The same issue that has split other circuit courts is now before our court. We review the grant of summary judgment and questions of statutory interpretation de novo. *See, e.g.*, *Okonowsky v. Garland*, 109 F.4th 1166, 1178 (9th Cir. 2024); *United States v. Harris*, 983 F.3d 1125, 1126 (9th Cir. 2020).

II

When interpreting a statute, we give statutory terms their plain, ordinary meaning. *See, e.g.*, *Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 277 (2018); *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009). But "[w]hen a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning." *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000). We also read "the words of a statute . . . in their context and with a view to their place in the overall statutory scheme." *Trim v. Reward Zone USA LLC*, 76 F.4th 1157, 1161 (9th Cir. 2023) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)); *see also Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 7 (2011) (explaining that statutory interpretation "depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis" (quotations omitted)). That is, we "construe statutes, not isolated provisions." *Graham Cty. Soil & Water Conservation Dist. v. Wilson*, 559 U.S. 280, 290 (2010) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 568 (1995)).

Construing text in context requires consideration of whether the statutory text sustains the interpretation placed upon it, that is, whether the words Congress used are best construed as accomplishing the legal consequence attributed

to them.  *See, e.g.*, *United States v. Tinklenberg*, 563 U.S. 647, 655 (2011).   As the Supreme Court put it, "when Congress wishes to alter the fundamental details of a regulatory scheme . . . we would expect it to speak with the requisite clarity to place that intent beyond dispute." *United States Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 621 (2020) (quotations omitted).  This principle, stated in different ways in different decisions, pervades the Supreme Court's cases involving statutory interpretation. *See, e.g.*, *Learning Res., Inc. v. Trump*, 607 U.S. 229, 245 (2026) (observing that "Congress seldom effects such sea changes through vague language" (quotations omitted)); *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 499 (2018) (discussing "the rule that Congress 'does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions'" (quoting *Whitman v. Am. Trucking Ass'n*, 531 US. 457, 468 (2001))); *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 465 (2017) (observing that "if, and when, Congress were to intend a major departure" from prevailing practice, "we would expect to see some affirmative indication" of that intent); *Biden v. Nebraska*, 600 U.S. 477, 511–17 (2023) (Barrett, J., concurring) (explaining that "textualists, like all interpreters," "situate[] text in context," considering "commonsense principles of communication").

In this case, we conclude that § 1225(b)(2)(A), based on its text and context, is best construed as applying to aliens entering the United States at the border.  Section 1226, by contrast, is best understood as governing inadmissible and deportable aliens present in the interior of the United States. While the relevant statutory provisions are not pellucidly clear, the text, context, and history of the INA are more supportive of the plaintiffs' interpretation.  To the extent

there is any remaining doubt, we are aided by the common-sense principle that Congress would have spoken more clearly if it had intended the dramatic expansion of mandatory detention authority that the government's new interpretation portends. And we are aided by the further common-sense intuition that a change of this magnitude would likely not have gone unnoticed and unobserved in the nearly thirty years since it was allegedly put into place. Because it is the government's current interpretation that suffers from greater textual and other problems, that interpretation does not reflect the best reading of the statute.

### A

#### 1

To begin our analysis, it is clear that plaintiffs—a class of unadmitted aliens present in the United States—are at least facially subject to detention under 8 U.S.C. § 1226(a), which allows for release on bond. *See Jennings*, 583 U.S. at 303. Section 1226(a) permits (but does not require) the government upon a warrant to arrest and detain "*an alien* . . . pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a) (emphasis added). Rodriguez Vazquez is an alien who was apprehended pursuant to a warrant. And by its terms, § 1226(a) is not limited to aliens of any particular admission status, but instead refers broadly to aliens subject to removal.

The facial breadth of § 1226(a) and its presumptive coverage of unadmitted aliens present inside the United States is confirmed by § 1226(c), which mandates detention and withdraws the possibility of release on bond for certain criminal aliens who are either deportable (meaning previously admitted, but now subject to removal) *or* inadmissible on the grounds identified. *See* 8 U.S.C.

§ 1226(c).    Congress's decision to include inadmissible aliens within § 1226(c)'s mandatory detention regime further confirms that, absent some other overriding provision, § 1226(a)'s baseline detention authority likewise encompasses such inadmissible aliens. *See Jennings*, 583 U.S. at 288–89 (describing § 1226(c) as an exception to § 1226(a)'s "default rule"); *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 400 (2010) ("The fact that Congress has created specific exceptions to [the Rule] hardly proves that the Rule does not apply generally.    In fact, it proves the opposite.").    This is demonstrated even more specifically by § 1226(c)(1)(E), which requires the mandatory detention of aliens inadmissible under § 1182(a)(6)(A) for being present in the United States without admission or parole, if they have committed a qualifying criminal act.    That such aliens are subject to mandatory detention under § 1226(c)(1)(E) implies that aliens who are present without admission, but who have not committed such a qualifying criminal act, remain subject to § 1226(a).

It is therefore clear that, absent anything further, § 1226(a) would apply to aliens inadmissible on the ground of being present without admission. *See, e.g.*, *Barbosa da Cunha*, 175 F.4th at 73.

2

The government concedes this much.    But in arguing that plaintiffs are subject to mandatory detention without the possibility of bond, the government responds that 8 U.S.C. § 1225(b)(2)(A), as a more specific provision, governs detention for aliens in the plaintiffs' position, over and above § 1226. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) ("[I]t is a commonplace of statutory

construction that the specific governs the general."). This raises the question whether § 1225(b)(2)(A) is limited to the border (the traditional understanding), or whether it also applies to aliens apprehended in the interior of the United States who have not previously been admitted.

Section 1225(b)(2)(A) provides that "[s]ubject to subparagraphs (B) and (C), in the case of an alien who is *an applicant for admission*, if the examining immigration officer determines that an alien *seeking admission* is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." (Emphasis added). Critical to the dispute in this case, § 1225(a)(1) earlier provides that "[a]n alien *present in the United States* who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival . . . ) *shall be deemed* for purposes of this chapter *an applicant for admission*." 8 U.S.C. § 1225(a)(1) (emphasis added).

From these two provisions, a few points are undisputed. Aliens subject to § 1225(b)(2)(A) must be mandatorily detained without bond. *See, e.g.*, *Jennings*, 583 U.S. at 300. It is undisputed that plaintiffs, who are present here without permission, are not "clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A); *see id.* § 1182(a)(6)(A) (rendering inadmissible "[a]liens present without admission or parole"). And it is undisputed that the plaintiffs here are "applicants for admission," because, again, they are present in the United States without admission. *See id.* § 1225(a)(1). What the government now disputes is whether the undefined phrase "seeking admission" in 8 U.S.C. § 1225(b)(2)(A) imposes an additional requirement—that to be subject to this mandatory detention authority, an alien must be seeking entry into the

United States at the nation's border.  *See Barbosa da Cunha*, 175 F.4th at 73–74.

That border-oriented view of § 1225(b)(2)(A) is how the provision has been traditionally understood and enforced since 1996, consistent with a lengthy pre-IIRIRA history of treating unadmitted aliens present inside the United States as subject to discretionary detention with the availability of release on bond.  There is a straightforward basis in the statutory text for this long-held understanding.  The word "admission" under the INA is specifically defined as "the lawful *entry* of the alien *into* the United States after inspection and authorization by an immigration officer."  8 U.S.C. § 1101(a)(13)(A) (emphasis added).  Combined with the word "seeking," § 1225(b)(2)(A) has been treated as requiring that an alien be engaged in the affirmative process of attempting to gain "entry" "into" the country, which an alien does at the border (or a port of entry).  And although "admission" is defined as "lawful entry," *id.* § 1101(a)(13)(A), it is clear that § 1225(b)(2)(A) is not limited to aliens seeking entry at a port of arrival.  That is because, among other things, § 1225(b)(2)(C) confirms that § 1225(b)(2)(A) applies to aliens arriving on land "whether or not at a designated port of arrival."  *Id.* § 1225(b)(2)(C).

This traditional border-focused interpretation has several virtues.  Importantly, it gives independent meaning to the words "seeking admission" in § 1225(b)(2)(A), by capturing those who are seeking "*entry . . . into* the United States."  8 U.S.C. § 1101(a)(13)(A) (emphasis added); *see U.S. ex rel. Claussen v. Day*, 279 U.S. 398, 401 (1929) ("The word 'entry' by its own forces implies a coming from outside."); *Torres*, 976 F.3d at 924 (explaining that "although the INA does not currently define the term 'entry,' we have long understood this term to refer to coming from outside into the

United States" (quotations omitted)).  By giving effect to the phrase "seeking admission," the traditional understanding of § 1225(b)(2)(A) accords with the interpretive principle that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)); *see also Williams v. Taylor*, 529 U.S. 362, 404 (2000) (describing as a "cardinal principle of statutory construction that we must 'give effect, if possible, to every clause and word of a statute'" (quoting *United States v. Menasche*, 348 U.S. 529, 538–39 (1955))).  The traditional understanding of § 1225(b)(2)(A) also accords with the ordinary understanding of the present participle "seeking," which normally would be used to describe someone actively doing something.  *See* Webster's New World College Dictionary 1299 (4th ed. 1999) ("seek" means "to request, ask for"); *Hernandez Alvarez*, 175 F.4th at 1267–68 (observing that "seeking" "indicat[es] an affirmative step of search or pursuit" (citing Oxford English Dictionary, https://www.oed.com/dictionary/seek_v [https://perma.cc/T45G-5P67])); *Santillan Quiroz*, 2026 WL 1876709, at *6 ("The choice of present participle . . . requires present and continuing action."); *accord Barbosa da Cunha*, 175 F.4th at 74; *Lopez-Campos*, 175 F.4th at 722–23.

Finally, the long-held treatment of § 1225(b)(2)(A) also coheres with the statute's reference to an "examining immigration officer."  Although the INA defines "immigration officer" broadly, *see* 8 U.S.C. § 1101(a)(18); 8 C.F.R. § 287.5(c), the statute here describes the officer as "examining" aliens.  The word "examining" more naturally describes a formal examination, something that traditionally

occurs at the nation's borders. *Cf.* 8 U.S.C. § 1222(a)–(b) (referring to "examination of arriving aliens" suspected of "mental or physical . . . disabilities" "at ports of the United States"). This is corroborated by the fact that, in the pre-IIRIRA statutory predecessors for mandatory detention, Congress similarly used the phrase "examining immigration officer" and explicitly tied application of the provision to the border. *See* INA, 66 Stat. at 199 ("Every alien . . . who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained."); Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, 1271 (1996) ("[I]f the examining immigration officer determines that an alien seeking entry is not clearly and beyond a doubt entitled to enter, the alien shall be detained for a hearing before a special inquiry officer.").

In short, there is a clear textual basis for the plaintiffs' position that § 1225(b)(2)(A) applies to aliens seeking to enter the United States at the border—an interpretation that is also consistent with longstanding practice and the Supreme Court's description of the detention regime in *Jennings*.

3

The government now contends that there is a superior interpretation of § 1225(b)(2)(A) that invalidates the last three decades of Executive Branch practice. Hanging its hat on § 1225(b)(2)(A)'s reference to an "applicant for admission," the government argues that all aliens who are present inside the United States without admission are subject to mandatory detention under § 1225(b)(2)(A). That is because, according to the government, an "applicant for admission" is necessarily "seeking admission." In the

government's view, an unadmitted alien who is an "applicant for admission" through his presence in the United States is effectively in the perpetual state of "seeking admission."

The government bases its interpretation on its own ordinary meaning argument—that as a matter of common parlance one who is an "applicant" for something is also "seeking" that same thing. *See also Buenrostro-Mendez*, 166 F.4th at 502 ("'apply' means '[t]o make a formal request (to someone for something),'" and "'seek' means 'to request, ask for'" (quoting Webster's New World College Dictionary 69, 1299) (4th ed. 1999)). As the Fifth Circuit posited in crediting this argument, a person who applies to college also seeks admission to that college, "regardless whether the person actively engages in further affirmative acts to gain admission." *Id.*; *see id.* at 502 ("Just as an applicant to a college seeks admission, an applicant for admission to the United States is 'seeking admission' to the same."). The government also argues that if the traditional understanding of § 1225(b)(2)(A) were correct, Congress could have referred more directly to "arriving aliens," as it did elsewhere in the statute, as opposed to using the phrases "applicant for admission" and "seeking admission." *Id.* at 504 ("Congress did not hesitate to use the 'arriving alien' language elsewhere in § 1225.").

The government's newfound interpretation of § 1225(b)(2)(A) has some initial intuitive force, but there are good reasons to reject it as a textual matter. For one, if all applicants for admission are necessarily "seeking admission," as the government maintains, it is unclear why Congress would have included the phrase "seeking admission" in § 1225(b)(2)(A). *See Lopez-Campos*, 175 F.4th at 723 (observing the government's interpretation

"render[s] § 1225(b)(2)(A)'s use of 'seeking admission' superfluous"); *accord Santillan Quiroz*, 2026 WL 1876709, at \*8; *Barbosa da Cunha*, 175 F.4th at 75; *Hernandez Alvarez*, 175 F.4th at 1271. The government responds that because there are various ways of "seeking admission" besides being an "applicant for admission," Congress drafted § 1225(b)(2)(A) to ensure coverage of a certain category of aliens "seeking admission," namely, those who are "applicants for admission." But this explanation does not give "seeking admission" independent meaning, because under that view Congress could have still accomplished the same thing by using only the phrase "applicant for admission." *See Barbosa da Cunha*, 175 F.4th at 77 ("Congress could have achieved the same outcome by using 'applicant for admission' alone and omitting 'seeking admission' entirely.").

The government replies that even if the phrase "seeking admission" is superfluous on its new reading, Congress can sometimes be redundant in statutory drafting. *See Barton*, 590 U.S. at 239 (explaining that "redundancies are common in statutory drafting—sometimes in a congressional effort to be doubly sure, sometimes because of congressional inadvertence or lack of foresight, or sometimes simply because of the shortcomings of human communication"); *see also Al Otro Lado*, 2026 WL 1825741, at \*8–9. This is true as a general matter. But in the context of § 1225(b)(2)(A) more specifically, and as a matter of the provision's plain language and sentence structure, the superfluous phrase here is integral to the provision's operation: it defines the actions of the alien that trigger examination by an immigration officer, which can in turn lead to significant consequences in the form of mandatory detention. And the superfluous phrase contains an important

defined term: "admission," which means "entry" "into the United States." 8 U.S.C. § 1101(a)(13)(A). Given these circumstances, our usual tolerance for some marginal surplusage makes less sense here.[1]

In addition to rendering superfluous the phrase "seeking admission," the government's plain meaning interpretation of "applicant for admission" is not the best way of understanding the relationship between §§ 1225(a)(1) and 1225(b)(2)(A). Indeed, the government's analytical approach is one that our precedents counsel against.

Recall that § 1225(a)(1) *deems* aliens present in the United States to be applicants for admission, creating what we have described as "a term of art denoting a particular legal status," *i.e.*, "a fictive legal status for purposes of

---

[1] Our dissenting colleague suggests that the government's interpretation "may well not create any redundancy at all" because the phrase "seeking admission" in § 1225(b)(2)(A) shows that applicants for admission who withdraw their application under 8 U.S.C. § 1225(a)(4) are not subject to mandatory detention. Dissent at 91–92 (citing *Lopez-Campos*, 175 F.4th at 741–42 (Murphy, J., dissenting)). The government has not made this argument, perhaps because it lacks merit. Section 1225(a)(4) allows applicants for admission, "in the discretion of the Attorney General," to "withdraw the application for admission and depart immediately from the United States." Because an alien who wishes to withdraw an application for admission could already attempt to do so under § 1225(a)(4), the government's reading—by which all "applicants for admission" are necessarily "seeking admission"—still renders "seeking admission" in § 1225(b)(2)(A) unnecessary. *Cf. Santillan Quiroz*, 2026 WL 1876709, at *11 n.10 (rejecting this same argument); *Lopez-Campos*, 175 F.4th at 724 (same). Nor is it apparent that § 1225(a)(4), a form of discretionary relief that benefits aliens, is designed to operate beyond aliens arriving at the border or a port of entry. *See United States v. Cisneros-Resendiz*, 656 F.3d 1015, 1020 (9th Cir. 2011) ("[A]n IJ may grant an alien's request for withdrawal only if . . . the alien is an arriving alien." (citing 8 C.F.R. § 1240.1(d)).

removal proceedings." *Torres*, 976 F.3d at 927–28. That is, "an alien is an 'applicant for admission' even though no literal 'application' is filed." *Avila*, 170 F.4th at 1135.

In ordinary usage, however, we would not normally regard someone present in the United States to be in the perpetual state of "seeking" entry into the United States. And unlike the term "applicant for admission," which is a special term of art in the statute, *Torres*, 976 F.3d at 927, the word "seeking" in § 1225(b)(2)(A) is not defined and would therefore presumptively retain its ordinary meaning. Because § 1225(a)(1) creates a specialized construct through the term "applicant for admission" and includes in that term of art aliens who do not meet its plain meaning, it therefore does not follow that we should then consider the fact that the isolated words "applicant" or "apply," and "seek" or "seeking," share a common ordinary meaning connoting a continuous state of doing those things. *See Barbosa da Cunha*, 175 F.4th at 75–76; *Hernandez Alvarez*, 175 F.4th at 1270–71; *Lopez-Campos*, 175 F.4th at 728; *Santillan Quiroz*, 2026 WL 1876709, at *9. As the Tenth Circuit has explained, the government's new interpretation "conflates ordinary and statutory meaning." *Santillan Quiroz*, 2026 WL 1876709, at *9.

Our en banc decision in *Torres* is highly relevant in this regard, for it demonstrates that an alien should not be regarded as being in a perpetual state of "seeking admission" or "applying" for it, for purposes of other statutory provisions, just because he is deemed an "applicant for admission" in § 1225(a)(1). In *Torres*, we held that an unadmitted alien's physical presence, which made her an "applicant for admission" for purposes of 8 U.S.C. § 1225(a)(1), did not on its own mean she had thereby made an "application for admission" for purposes of 8 U.S.C.

§ 1182(a)(7). *Torres*, 976 F.3d at 922, 927–29; *see* 8 U.S.C. § 1182(a)(7) (providing that "any immigrant at the time of application for admission . . . who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter" is inadmissible). We accordingly overruled our prior decision in *Minto v. Sessions*, 854 F.3d 619 (9th Cir. 2017), which had held otherwise.

As we explained in *Torres*, "*Minto* misread th[e] deeming provision, which places some physically-but-not-lawfully present noncitizens into a fictive legal status for purposes of removal proceedings, as altering the meaning of a substantive ground of inadmissibility that refers to the time of a real event: an actual application for admission." 976 F.3d at 928. That reading, we explained, "conflated the term 'applicant for admission' from § 1225(a)(1) with the term 'application for admission' in § 1182(a)(7)," thus "fail[ing] to understand that the phrase 'applicant for admission' is a term of art denoting a particular legal status." *Id.* at 927. We thus specifically rejected the notion "that any applicant for admission should be treated as having made a continuing application for admission that does not terminate 'until it is considered by the Immigration Judge (IJ).'" *Id.* at 922 (quoting *Minto*, 854 F.3d at 624) (brackets omitted); *see also id.* at 929 (discussing a BIA decision that similarly "emphasiz[ed] that the term 'applicant for admission' in the deeming provision" is "distinguishable from 'applying . . . for admission to the United States within the meaning of' § 1182(h)" (quoting *Matter of Y-N-P*, 26 I. & N. Dec. 10, 13 (BIA 2012))).

As we later explained it, *Torres* "rejected the view that an alien remains in a perpetual state of applying for admission" simply because he is regarded as an "applicant

for admission" under § 1225(a)(1). *United States v. Gambino-Ruiz*, 91 F.4th 981, 989 (9th Cir. 2024). Instead, *Torres* "stands for the propositions that an immigrant submits an 'application for admission' at a distinct point in time," and that "stretching the phrase 'at the time of application for admission' to refer to a period of years would push the statutory text beyond its breaking point." *Id.* at 990 (quoting *Torres*, 976 F.3d at 990) (cleaned up).

"Seeking admission," that is seeking "entry," 8 U.S.C. § 1101(a)(13)(A), also most naturally refers to a particular point in time, namely, the time an alien "'com[es] from outside' into the United States." *Torres*, 976 F.3d at 924 (quoting *Claussen*, 279 U.S. at 401). *Torres* rejected the theory that the time of an application for admission "continues, potentially for years or decades." *Id.* at 926 (emphasis omitted). But if the legal construct "applicant for admission" does not mean "an alien remains in a perpetual state of applying for admission," *Gambino-Ruiz*, 91 F.4th at 989, we do not think an alien present in the interior of the United States remains in the perpetual state of seeking admission (that is, seeking *entry*), either. The government's new interpretation of § 1225(b)(2)(A) is in significant tension, if not outright conflict, with the logic of *Torres*. The same can be said of the dissent, which purports to apply a "non-specialized, ordinary meaning" to the phrase "applicant for admission," Dissent at 70, even though *Torres* holds that it is "a term of art" that should not be "conflate[d]" with other facially similar language in the INA. 976 F.3d at 922, 927.

Indeed, other uses of "applicant for admission" confirm that the INA uses the phrase as a legal classification identifying a category of aliens subject to specified procedures or consequences, not in its colloquial sense. *See*

8 U.S.C. § 1225(a)(3) ("All aliens . . . *who are* applicants for admission" shall be subject to inspection (emphasis added)); *id.* § 1229a(c)(2)(A) ("if the alien *is* an applicant for admission" he bears the burden of proof in showing his admissibility in a removal proceeding (emphasis added)). Section 1225(b)(2)(A) is constructed similarly. *See id.* § 1225(b)(2)(A) ("in the case of an alien *who is* an applicant for admission" (emphasis added)).

For all these reasons, we conclude that "applicant for admission" in § 1225 is best treated as a term of art used to identify a class of people that do not meet the plain meaning understanding of that term, and that imbues them with "a fictive legal status." *Torres*, 976 F.3d at 927–28. And from this we conclude that any plain meaning comparison of the phrases "applicant for admission" and "seeking admission" does not properly account for the stylized treatment of the former and the default plain meaning treatment of the latter. *See, e.g.*, *Hernandez Alvarez*, 175 F.4th at 1267.

The government draws an analogy to an applicant for college who thereby seeks admission to college. But the issues appear different if we think of a statute that deems as "applicants for college" persons who do not naturally or inevitably fit that description, like all high school seniors who have completed certain coursework. It is not apparent that we would regard all of the students as seeking admission to college when they have no plans to go. When people are placed into a legal classification that—as a matter of ordinary meaning—would not typically apply to them ("applicants for admission"), it does not mechanically follow that those people should thereby fall within other aspects of the statute that otherwise would share an ordinary meaning with what is in fact an unordinary term-of-art classification.

The government's interpretation also sits uneasily with the sentence structure of § 1225(b)(2)(A) itself. The provision begins by identifying a category of aliens ("in the case of an alien who is an applicant for admission") and then proceeds to describe an alien "seeking admission." 8 U.S.C. § 1225(b)(2)(A) ("[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained."). Under the government's theory the latter phrase is broader than the former: every "applicant for admission" is perpetually "seeking admission," but other aliens beyond "applicants for admission" could also be "seeking admission." If that is the case, though, the sentence is unusually crafted, for modifying clauses such as this would more commonly be read to narrow, clarify, or characterize the antecedent they follow. And here, the provision as drafted reads as though it begins with a broader concept which is then narrowed, rather than the reverse. Accordingly, the traditional view of the statute, which understands those "seeking admission" to encompass the narrower category of aliens seeking entry at the border, better accords with the way § 1225(b)(2)(A) as a sentence is constructed.

This does not leave the phrase "applicant for admission" without work to perform in the statute. There is a plausible reason why § 1225(b)(2)(A) is not limited to "arriving aliens," namely, because "arriving alien" can be understood to refer only to aliens arriving at a port of entry. Indeed, that is how IIRIRA's implementing regulations define it. *See Gambino-Ruiz*, 91 F.4th at 986 (explaining that "since 1997 the government has defined the term 'arriving alien' narrowly to mean 'applicant for admission coming or

attempting to come into the United States at a port-of-entry'"
(quoting 8 C.F.R. § 1001.1(q)).   This may explain why
§ 1225 refers to aliens who arrive in the United States
"whether or not at a designated port of arrival."   8 U.S.C.
§ 1225(a)(1), (b)(2)(C).  By using "applicant for admission,"
Congress confirmed that § 1225(b)(2)(A) covered aliens
who are seeking entry in between the nation's ports of entry,
a point that § 1225(b)(2)(C) later validates.[2]

And beyond this, the term "applicant for admission"
elsewhere performs critical work in the statute.     As
discussed, § 1225(a)(1) clarifies that aliens present inside
the United States without admission are subject to removal
on broader grounds than those aliens who have been lawfully
admitted, while also imposing on those unadmitted aliens
greater procedural burdens in the context of removal
proceedings.  *See Ortega-Lopez*, 978 F.3d at 682 (observing
that under IIRIRA, "a person who physically entered the
United States but was not admitted is subject to grounds of
inadmissibility, rather than deportability, and has to bear the
corresponding burden of proving admissibility"); *Torres*,
976 F.3d at 928 (observing that, in light of § 1225(a)(1), "the
relevant distinction for procedural purposes" in removal
proceedings "is whether the immigrant has been lawfully
admitted, regardless of actual physical presence"); 8 U.S.C.
§ 1229a(c)(2).

In sum, these various considerations show that the
government's new interpretation does not follow from the
assertedly unambiguous language of the statute.   Instead, the
government's reading is the less compelling one, as it raises

---

[2] The dissent maintains that under the traditional understanding of
§ 1225(b)(2)(A), the phrase "applicant for admission" is superfluous.
Dissent at 89, 91.  That is flatly incorrect.

various textual and interpretive problems, especially in view of *Torres*.

4

The other provisions in § 1225 do not advance the government's position, or at least not enough to resolve the difficulties that arise from the government's new interpretation of § 1225(b)(2)(A).

The government first points to § 1225(a)(3), which mandates the inspection of "[a]ll aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States." The government reasons that this provision shows that Congress denoted "applicants for admission" as a "subset" of those seeking admission, insofar as "otherwise" sets off "applicants for admission" from "seeking admission." *See Buenrostro-Mendez*, 166 F.4th at 503; *Avila*, 170 F.4th at 1135 n.4.

But the government's reading of the word "otherwise" in § 1225(a)(3) is not the only one. Courts have at times treated the words "or otherwise" to mean that the terms that follow encompass a broader set, as the government would have it. *See Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 535 (2015) ("'Otherwise' means 'in a different way or manner.'" (quoting Webster's Third New International Dictionary 1598 (1971))); *Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 963–64 (11th Cir. 2016) (en banc) (observing that Congress often uses the phrase "or otherwise" to denote a "subset").

But the Supreme Court has in other contexts "rejected the argument that 'or otherwise' mandates the subset-

superset interpretation urged by the government." *Barbosa da Cunha*, 175 F.4th at 78–79 (citing *Helsinn Healthcare S.A. v. Teva Pharmaceuticals USA, Inc.*, 586 U.S. 123, 125, 132 (2019)); *see also Hernandez Alvarez*, 175 F.4th at 1273 (observing as to § 1225(a)(3) that "there are two different ways to read the ambiguous phrase 'or otherwise'"). That is, "or otherwise" could also mean "something that is different from something already mentioned." *Hernandez Alvarez*, 175 F.4th at 1273 (quotations omitted). And to the extent "applicants for admission" are a subset of "seeking admission" in § 1225(a)(3), as the government argues, it would seem that "applicants for admission" should then be regarded as a subset of everything else in the rest of § 1225(a)(3). But in that scenario, "applicants for admission" would also be a subset of those seeking "readmission to or transit through the United States," 8 U.S.C. § 1225(a)(3), which does not easily follow. In short, § 1225(a)(3) is at best a wash for the question before us. *See, e.g.*, *Barbosa da Cunha*, 175 F.4th at 78–81; *Santillan Quiroz*, 2026 WL 1876709, at *12; *Hernandez Alvarez*, 175 F.4th at 1273.

The government also cites § 1225(a)(4), which provides that "[a]n alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States." The government argues this provision shows that an "applicant for admission" under § 1225(a)(1) is in a constant state of "applying" for admission, again invoking the similarity in ordinary meaning between the verbs "applying" and "seeking." But nothing in § 1225(a)(4) suggests, contrary to *Torres*, that "applying for admission" is a perpetual event that "continues, potentially for years or decades." *Torres*,

976 F.3d at 926 (emphasis omitted); *see also Gambino-Ruiz*, 91 F.4th at 989 (same). Section 1225(a)(4) thus adds little, if anything, to the theory that an applicant for admission is in a perpetual state of seeking entry.

The Fifth Circuit also relied on § 1225(a)(5) in crediting the government's interpretation. *See Buenrostro-Mendez*, 166 F.4th at 503. Section 1225(a)(5) provides that:

> An applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in seeking admission to the United States, including the applicant's intended length of stay and whether the applicant intends to remain permanently or become a United States citizen, and whether the applicant is inadmissible.

In the Fifth Circuit's view, this provision shows that an "applicant for admission" is "seeking admission." *See Buenrostro-Mendez*, 166 F.4th at 503.

But § 1225(a)(5) simply indicates that "applicants for admission *can* be seeking admission, not that they must be." *Santillan Quiroz*, 2026 WL 1876709, at *12. Section 1225(a)(5) is consistent with the traditional understanding of § 1225(b)(2)(A), namely, that the set of aliens "seeking admission" is a narrower category than those who are "applicant[s] for admission," describing only those applicants "seeking" entry. 8 U.S.C. § 1225(a)(5); *see also Hernandez Alvarez*, 175 F.4th at 1272 ("The usage of 'seeking admission' in this context further suggests that the phrase refers to one who is actively seeking to enter the

United States."). In this regard, and given the overarching border-focused nature of § 1225, the government's position is undermined by the fact that the required statement "under oath" about the alien's "intended length of stay," 8 U.S.C. § 1225(a)(5), is a less natural question to pose to an alien who has resided in the United States for many years, and would make more sense posed to an alien at the border. *See Barbosa da Cunha*, 175 F.4th at 81; *Hernandez Alvarez*, 175 F.4th at 1272–73. Thus, § 1225(a)(5) at minimum does not provide independent support for the government's interpretation of § 1225(b)(2)(A).

The government also argues that the traditional treatment of § 1225(b)(2)(A), which requires that an alien seek entry into the United States at the border, is undermined by § 1225(b)(2)(C). That provision states that "[i]n the case of an alien described in [§ 1225(b)(2)(A)] who is arriving on land (*whether or not at a designated port of arrival*) from a foreign territory contiguous to the United States," the government can return the alien to that territory pending removal proceedings. 8 U.S.C. § 1225(b)(2)(C) (emphasis added). That provision, according to the government, shows that illegal border-crossers are subject to § 1225(b)(2)(A)'s initial scope.

But this point also does not add to the government's position. Illegal border-crossers are indeed subject to § 1225(b)(2)(A). But that is because, among other things, § 1225(b)(2)(C) confirms that an alien "who is arriving on land (whether or not at a designated port of arrival)" falls within "subparagraph (A)." *Id.* Aliens illegally crossing the border are, of course, at that time seeking "entry." But contrary to the government, this does not lead to the conclusion that aliens like plaintiffs who are seeking relief in immigration proceedings inside the United States are also

"seeking admission," that is, seeking "entry" into the United States. *See Matter of Pierre*, 14 I. & N. Dec. 467, 468 (BIA 1973) (discussing the concept of "entry" under the INA, which includes a "crossing into the territorial limits of the United States"); *Torres*, 976 F.3d at 922 (rejecting the theory that "any applicant for admission should be treated as having made a continuing application for admission that does not terminate until it is considered by the Immigration Judge" (quotations and brackets omitted)).

5

In sum, the government offers possible arguments for why the traditional understanding of § 1225(b)(2)(A) is not inevitable. But its newfound interpretation of § 1225(b)(2)(A) and the surrounding § 1225 text encounters significant difficulties. For the reasons we have given, the traditional understanding of § 1225(b)(2)(A) as limited to aliens encountered at the border finds greater support in the statutory text of § 1225, considered as a whole.

But even if this point were more doubtful, any ambiguities in § 1225(b)(2)(A) cut against, not for, the government's asserted authority. The language of § 1225(b)(2)(A) is at times awkward and poorly executed. *See Hernandez Alvarez*, 175 F.4th at 1271 (describing § 1225(b)(2)(A) as "circuitous and layered"). And as the foregoing discussion shows, while the government's interpretation has some hold in the statutory text, even when we limit our focus to § 1225—we will turn to § 1226 next—we see that, at the very least, reaching the government's new interpretation involves a labored process that raises numerous interpretive problems along the way. These problems are more extensive than any problems associated

with an interpretation of § 1225(b)(2)(A) that aligns with how it has been traditionally enforced.

We may fairly ask: if the statute is meant to require the mass detention of unadmitted aliens present in the United States and mark a sharp break from the past, would Congress have introduced such a major change through a cross-referenced deeming provision, in the way the government asserts? As a matter of basic communication, we likely should not need to work through so many questions and complications to detect a groundbreaking alteration of our immigration detention regime. *See Whitman*, 531 U.S. at 468 (explaining that Congress is unlikely to confer significant authority through "modest words," "vague terms," or "subtle device[s]"); *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 231 (1994) (observing that Congress is "unlikely" to use "a subtle device" to achieve a major change).

And when we consider the prior versions of the statutory provision at issue, it becomes even less plausible to think that Congress in 1996 effected a major change through the use of the stilted language in § 1225(b)(2)(A). The 1952 version of the INA read:

> Every alien . . . who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further

> inquiry to be conducted by a special inquiry
> officer.

66 Stat. at 199.  Similarly, the version in place in 1996, before the passage of IIRIRA, read:

> Except as provided in subparagraph (B), if
> the examining immigration officer
> determines that an alien seeking entry is not
> clearly and beyond a doubt entitled to enter,
> the alien shall be detained for a hearing
> before a special inquiry officer.

AEDPA, 110 Stat. at 1271.  Congress in IIRIRA updated § 1225(b)(2)(A) to reflect the new concept of "admission." But again, "admission" is specifically defined as "the lawful *entry* of the alien *into* the United States after inspection and authorization by an immigration officer."   8 U.S.C. § 1101(a)(13)(A) (emphasis added).  And if we plug that definition into § 1225(b)(2)(A), we get something very similar to what Congress had before: "Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking [lawful entry into the United States] is not clearly and beyond a doubt entitled to [lawful entry], the alien shall be detained for a proceeding under section 1229a of this title."   (As discussed above, other aspects of § 1225 make clear that § 1225(b)(2)(A) covers illegal border-crossers, even as the focus remains "entry.")

The fact that § 1225(b)(2)(A) follows the same basic sentence structure and includes much of the same wording as prior versions of this provision cuts against reading the

1996 changes in IIRIRA as a complete overhaul of this mandatory detention provision, which was consistently limited to aliens at the border. *See Niz-Chavez v. Garland*, 593 U.S. 155, 165 (2021) (considering "IIRIRA's statutory structure and history" to resolve "any doubt remain[ing] about the meaning" of statutory provisions); *Hernandez Alvarez*, 175 F.4th at 1281 ("Congress did not construct § 1225(b)(2)(A) from whole cloth—the language finds deep roots in the country's historical immigration laws and practices."). It is doubtful that Congress would accomplish such a dramatic departure from historical practice through a web of cross-references, redundant qualifications, and the word "otherwise" in a separate provision. *See Barbosa da Cunha*, 175 F.4th at 93 ("If Congress meant to achieve such a radical break from the past, it would not have done so in such an indirect and ambiguous way."). And it is further doubtful Congress would do so while carrying forward much of the prior statutory language and including, by the government's reading, unnecessary language ("seeking admission") whose plain meaning does not naturally cover the category of aliens at issue in this case.

In short, if the statute were departing from prior law and practice and imposing a new mass detention requirement, Congress would have drafted language more direct than what we have in § 1225(b)(2)(A) and the rest of § 1225. *See Biden v. Texas*, 597 U.S. 785, 798 (2022) ("If Congress had wanted the provision to have that effect, it could have said so in words far simpler than those that it wrote."). The "oblique" and "elliptical" language of § 1225(b)(2)(A), *West Virginia v. EPA*, 597 U.S. 697, 723 (2022), does not approach the "requisite clarity" we would expect if "Congress wish[ed] to alter the fundamental details" of the mandatory detention scheme. *United States Forest Serv.*,

590 U.S. at 621 (quotations omitted); *see Whitman*, 531 U.S. at 468.  And if we broaden the lens beyond § 1225, as we will do next, we see that the government's interpretation of § 1225(b)(2)(A) faces further hurdles.

B

When we consider § 1226, the government's view that § 1225(b)(2)(A) should be read as accomplishing a groundbreaking change in mandatory detention policy becomes even more doubtful. *Mellouli v. Lynch*, 575 U.S. 798, 809 (2015) (explaining that "[s]tatutes should be interpreted 'as a symmetrical and coherent regulatory scheme'" (quoting *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133)).

As we recounted above, § 1226(a) on its face applies to aliens who are present in the United States without admission. *See Hernandez Alvarez*, 175 F.4th at 1278 ("This language applies to both admitted and unadmitted aliens, since either may be subject to removal proceedings.").  It follows that interpreting § 1225(b)(2)(A) in the manner the government requests—to apply to that same class of aliens— would substantially narrow the reach of § 1226(a), without a basis for doing so in the text of § 1226(a) itself.  Under this reading, § 1225(b)(2)(A) would mandate detention for all unadmitted aliens also subject to § 1226(a)'s discretionary scheme, thereby carving these aliens out from § 1226(a). *See Barbosa da Cunha*, 175 F.4th at 86 (observing that "the government's interpretation reduces the applicability of Section 1226(a) to a subset of [aliens] narrower than the statutory text authorizes").  But there is no basis on the face of § 1226(a) to conclude that it covers only a narrower category of "aliens" than it purports to do.

To be sure, the government's position does not render § 1226(a) entirely superfluous. As the government points out, § 1226(a) would continue to apply to aliens who are admitted into the United States and later become removable. *See Buenrostro-Mendez*, 166 F.4th at 504–05 (explaining, *inter alia*, that "Section 1226(a) undeniably does work independent from § 1225(b)(2)(A) because only § 1226(a) applies to admitted aliens who overstay their visas" or "become deportable on many different grounds"). Still, if it was Congress's design to subject only this narrower subset of removable aliens to discretionary detention under § 1226(a), and to have the large population of aliens present in the United States without admission subject to mandatory detention under § 1225(b)(2)(A), Congress in § 1226 would have more likely given some textual indication of this important distinction. *See* 8 U.S.C. § 1226(a) (permitting detention with the possibility of bond of "*an alien . . .* pending a decision on whether the alien is to be removed from the United States" (emphasis added)). One can reasonably ask why Congress, in that event, would not have more clearly defined a narrower class of aliens as the ones subject to § 1226(a), as opposed to inviting a complicated debate about whether § 1225(b)(2)(A) splices them out. *See Barbosa da Cunha*, 175 F.4th at 86 ("Had Congress intended Section 1226(a) to apply more narrowly, it would not have written the section to cover 'an alien' without any further qualifications.").

Section 1226(c), which creates exceptions to discretionary detention under § 1226(a), casts further doubt on the government's new interpretation. As previously catalogued, Congress has, since before IIRIRA, mandated the detention of certain criminal aliens pending a determination on their removability. In IIRIRA, Congress

continued that practice by providing that aliens "inadmissible" and "deportable" on various criminal and national security grounds are subject to mandatory detention. *See* 8 U.S.C. § 1226(c)(1)(A)–(E). Although some provisions of § 1226(c) refer to "deportable" aliens (that is, those who were admitted but are now removable), other provisions refer specifically to aliens who are inadmissible. *Compare id.* §§ 1226(c)(1)(B), (C) (deportable), *with id.* §§ 1226(c)(1)(A), (E) (inadmissible), *and id.* § 1226(c)(1)(D) (inadmissible and deportable). One of these provisions was added to the INA just last year in the Laken Riley Act. *See* Pub. L. No. 119-1, § 2, 139 Stat. 3 (2025). After those amendments, § 1226(c) now mandates the detention of aliens who are inadmissible—including aliens present here without admission—who have *also* committed certain enumerated crimes. *See* 8 U.S.C. § 1226(c)(E)(i)–(ii); *id.* § 1182(a)(6)(A), (6)(C), (7). That § 1226(c) disallows bond for certain categories of inadmissible aliens strongly suggests that the broader § 1226(a) covers inadmissible aliens present in the United States. *See supra* 15–17; *see also Santillan Quiroz*, 2026 WL 1876709, at *14 ("[T]he subsections of § 1226(c) addressing inadmissible aliens would be rendered useless since there would be no inadmissible aliens to except from bond eligibility under § 1226(a)."); *Hernandez Alvarez*, 175 F.4th at 1279 ("Why, then, would § 1226(c) include exceptions for *both* deportable and inadmissible aliens, if the provision it limits (§ 1226(a)) only applies to admitted aliens?").

Under the government's interpretation, moreover, Congress's recent handiwork in the Laken Riley Act would be rendered superfluous, because those aliens subject to § 1226(c)(1)(E) would already be subject to mandatory

detention under § 1225(b)(2)(A), as inadmissible aliens present in the United States. *See Barbosa da Cunha*, 175 F.4th at 87–88. This superfluity is not insignificant. If we consider the statute as an integrated whole, it is more reasonable and natural to regard § 1226(c)(1)(E) as an additional ground for mandatory detention above and beyond the grounds that the law previously directed. *See, e.g.*, *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133 ("A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole." (quotations and citations omitted)); *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."). Section 1226(c)(1)(A), pertaining to aliens who are "inadmissible by reason of having committed any offense" covered in § 1182(a)(2), would also appear superfluous under the government's new interpretation. That is because, in the vast majority of instances, the only aliens present in the interior who can be charged with inadmissibility are aliens who have not been admitted (that is, applicants for admission). *See Guzman-Andrade v. Gonzales*, 407 F.3d 1073, 1076 (9th Cir. 2005).

The government replies that these provisions in § 1226(c) would still do independent work under its interpretation because within the ambit of its coverage, § 1226(c) only allows the release of aliens for witness protection purposes. *See id.* § 1226(c)(4). In contrast, an alien detained under § 1225(b)(2)(A) can be released through discretionary parole on a "case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). The government contends the availability of parole under § 1225(b)(2)(A) means that the

redundancies visited by its position do not detract from its reading of the statute. *See also Buenrostro-Mendez*, 166 F.4th at 505; *Avila*, 170 F.4th at 1137.

The government's argument about parole shows that, even if they cover the same aliens, § 1226(c)(1)(A) and (E) could have some arguable import beyond § 1225(b)(2)(A). But even assuming § 1226(c) could limit the availability of parole under § 1225(b)(2)(A), does § 1226(c) as a textual matter most naturally reflect this parole-based objective? It does not. If the import of § 1226(c)(1)(A) and (E) is merely to clarify the unavailability of parole for a narrow class of aliens already subject to mandatory detention under § 1225(b)(2)(A), there are far less obtuse ways Congress could have accomplished that objective, through any kind of particularized reference to parole. *See Hernandez Alvarez*, 175 F.4th at 1280. And while the government, like the dissent, points out that there is arguably some redundancy under § 1226(c) even on plaintiffs' reading of § 1225(b)(2)(A), the government's interpretation encounters much greater redundancy problems with § 1226(c). Those problems detract from the government's theory that the 1996 amendments made a sharp change in the law and imposed a large-scale detention mandate that went unnoticed and unenforced for the last thirty years.

The government also argues that any concern that the Laken Riley Act is surplusage is alleviated by the fact that when Congress passed the Laken Riley Act in 2025, it immediately had a significant effect, given the government's then-approach to § 1225(b)(2)(A). *See Buenrostro-Mendez*, 166 F.4th at 505 ("Congress passed the Act at a time when the Executive was still declining to exercise its full enforcement authority under the INA. Accordingly, the Act did have a substantial effect when passed insofar as it

required the detention without bond or parole of certain aliens the administration was then treating as bond-eligible." (footnote omitted)). This is true so far as it goes, although Congress could have also passed the Laken Riley Act on the understanding that § 1225(b)(2)(A) did not already cover these aliens. In any event, for present purposes the point is that in considering the statutory scheme as a whole, § 1226(c)(1)(E) more strongly supports the conclusion that the aliens it covers who did *not* commit qualifying criminal acts are already covered by § 1226(a). The government's interpretation would also make largely irrelevant § 1226(c)(1)(E), which Congress only recently added.

Were the text of § 1225(b)(2)(A) clearer in the government's favor, the redundancy in § 1226(c) caused by the government's reading would be of less concern. *See Barton*, 590 U.S. at 239. But as already discussed, we do not think that the words of § 1225(b)(2)(A), considered in context, direct the result the government claims, as that interpretation creates more textual and other difficulties than the traditional understanding of that provision. Accordingly, the redundancy in § 1226(c) introduced by the government's interpretation creates an additional cloud over the government's account of the statutory text. Section 1226 also continues to confirm what our reading of § 1225(b)(2)(A) suggests, namely, that the government at minimum is seeking to invoke a significant power "on an uncertain statutory basis." *Learning Resources*, 607 U.S. at 242.

Indeed, whereas the government in the context of § 1225(b)(2)(A) has affirmative arguments, when it comes to § 1226 the government is effectively on defense the entire time. It has to explain, among other things, why a broad provision (§ 1226(a)) is much narrower than it appears on its

face; why it matters not that other provisions in § 1226(c) are rendered superfluous by its reading, including amendments that Congress made very recently; and why we should regard the availability of parole as a critical distinction between parts of §§ 1225 and 1226, when the text does not identify that as a key differentiator. As we move from § 1225 to § 1226, then, the government's position meets even further resistance. This makes the government's new interpretation of § 1225(b)(2)(A) further unlikely when the statute is considered as an integrated whole.

## III

We now consider whether statutory purpose and the government's post-1996 enforcement practices can offer additional support for the government's interpretation of the statute.

## A

The government and the other circuits holding in its favor have relied to some extent on the posited congressional purpose of IIRIRA in reasoning that § 1225(b)(2)(A) applies to all aliens present inside the United States without admission. *See Buenrostro-Mendez*, 166 F.4th at 508 (concluding that "the government's interpretation better honors [the] predominant goal in the enactment of IIRIRA"); *Avila*, 170 F.4th at 1135–36 (same). The dissent in this case similarly places heavy reliance on perceived statutory purpose. Dissent at 73–78. The argument is that through IIRIRA's rejection of the distinction between deportation and exclusion proceedings, Congress meant to equalize the treatment of aliens who enter the country illegally and those who present themselves for lawful inspection at the border. Considering that aim, the government argues that its interpretation of § 1225(b)(2)(A), which subjects aliens

illegally present in the United States to mandatory detention just as it does those who seek admission at the border, better accords with congressional intent.

The government's argument from statutory purpose is not without some support. This court's case law has recognized that Congress in IIRIRA sought to rectify the "anomaly," *Torres*, 976 F.3d at 928, that "non-citizens who had entered without inspection could take advantage of the greater procedural and substantive rights afforded in deportation proceedings, while non-citizens who presented themselves at a port of entry for inspection were subjected to more summary exclusion proceedings." *Hing Sum*, 602 F.3d at 1100. Indeed, we have recognized that one of the innovations directed at addressing that "anomaly" was Congress's decision to deem all aliens present in the United States without admission "applicants for admission," which "ensures that all immigrants who have not been lawfully admitted, regardless of their physical presence in the country, are placed on equal footing in removal proceedings under the INA." *Torres*, 976 F.3d at 928. From this, the government argues that Congress meant to treat these aliens the same when it comes to mandatory detention.

But perceived statutory purpose is not the same as statutory text. And neither this court nor the Supreme Court has suggested that Congress intended to further its "equal footing" agenda by subjecting all unadmitted aliens inside the country to mandatory detention. To the contrary, as we noted above, the Supreme Court's decision in *Jennings* reflects the traditional understanding of the distinction between § 1225 and § 1226. Although the government's inference from statutory purpose is not an unreasonable one, it does not make up for the difficulties with the government's

new textual interpretation, because considerations of extra-textual purpose can only take us so far.

As an initial matter, our cases that have articulated Congress's "equal footing" concern relied on IIRIRA's legislative history. *See Torres*, 976 F.3d at 928 (citing House Report); *Hing Sum*, 602 F.3d at 1100 (citing legislative history materials for the "reasons for the [IIRIRA] amendment" creating the concept of admission). The other circuits that have held for the government on the issue before us have likewise relied on legislative history for the "equal footing" point, as well as on case law that itself relies on that legislative history. *See Avila*, 170 F.4th at 1135–36; *Buenrostro-Mendez*, 166 F.4th at 508.

But the legislative history materials do not indicate that the "equal footing" principle extended to every possible aspect of immigration law. Instead, these materials reflect Congress's purported intent to "replace *certain aspects* of the current 'entry doctrine,' under which illegal aliens who have entered the United States without inspection gain equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection at a port of entry." H.R. Rep. No. 104-469, pt. 1, at 225 (emphasis added). The legislative history does not mention that the millions of aliens unlawfully present in the interior of the United States are now subject to mandatory detention, as might be expected for a purported change of this magnitude. To the contrary, where the legislative history references bond, it expressed an intent to continue the prior regime of affording bond hearings to unadmitted aliens apprehended in the interior pending their removal proceeding. *See* Conference Report, H.R. Rep. No. 104-828, at 210 (1996) (indicating that the new § 1226(a) "restates the current provisions in section 242(a)(1) regarding the

authority of the Attorney General to arrest, detain, and release on bond an alien who is not lawfully in the United States"). We do not invoke this legislative history as authoritative, nor do we rely on it concluding that the plaintiffs have offered a better interpretation of the statute. Our point instead is that "equal footing" statements in our case law are rooted in legislative history, and that legislative history does not support the government's position on the specific issue of detention under § 1225(b)(2)(A). This counsels against placing substantial reliance on perceived statutory purpose, as it has been described in our case law.

In addition, and more generally, our ability to derive clear answers from a broadly framed statutory purpose is constrained by the principle that "no legislation pursues its purposes at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987). As the Supreme Court has explained, "[d]eciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Id.*; *see also, e.g.*, *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 368–69 (2025); *American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228, 233–34 (2013).

In this case, there are competing considerations that may have led Congress to continue to afford bond hearings to some aliens who are present inside the country illegally. *Rodriguez*, 480 U.S. at 525–26. For one, there were an estimated two million aliens present in the United States without admission as of the late 1990s. *See Barbosa da Cunha*, 175 F.4th at 90; H.R. Rep. No. 104-469, pt. 1, at 111 (1996). In the face of that substantial population, Congress

may have been concerned with the government's detention facility capacity, as well as the costs and other burdens associated with housing a very large number of unadmitted aliens pending their oftentimes lengthy removal proceedings.

It is apparent from IIRIRA's actual implementation that these considerations did indeed factor into Congress's decisionmaking to some extent. As we noted above, Congress in IIRIRA gave the Attorney General the discretion to delay § 1226(c)'s extended detention mandate for two years to alleviate anticipated detention space constraints and afford the government time to build capacity. *See* IIRIRA § 303(b)(2); H.R. Rep. No. 104-469, pt. 1, at 123 (1996) ("The INS plans to increase its detention space to about 8,500 beds in [fiscal year] 1996, an increase of close to 50 percent."). The Attorney General invoked that safety valve authority. *See Hernandez Alvarez*, 175 F.4th at 1283; *Barbosa da Cunha*, 175 F.4th at 89–90. The plaintiffs in this case point out that Congress did not delay implementation of § 1225(b)(2)(A), even though, by the government's interpretation, substantial additional detention capacity would be required given the much larger number of aliens at issue. But we need not theorize as to why Congress did not delay implementation of § 1225(b)(2)(A) to make the more basic observation that the delay afforded for § 1226(c) shows that detention capacity is a countervailing concern when it comes to how many aliens Congress may wish to place in mandatory detention.

Additionally, Congress could have concluded that unadmitted aliens who reside in the United States for extended periods are likely to develop family ties or serve roles in the economy, making their mandatory detention pending removal proceedings less desirable and more costly.

We do not attempt to ascribe these or any particular views to Congress in 1996. We simply observe that a general desire to place on equal footing for purposes of removal proceedings those unadmitted aliens present in the United States and those aliens arriving in the United States, *see Torres*, 976 F.3d at 928, does not inexorably extend to mandatory detention, given that such detention could produce disruptions and adverse consequences for families, employers, and others. By the government's theory, unadmitted aliens present in the United States would apparently be subject to mandatory detention even if they were brought here as young children or have lived here for decades. Congress could have determined that such persons present different considerations.

We note in this regard that although IIRIRA in some respects is less forgiving to aliens who enter without permission, the statute continues to give the Executive Branch the authority to cancel the removal of aliens who have continuously resided here for ten years and meet other requirements. *See* 8 U.S.C. § 1229b(b)(1); *Niz-Chavez*, 593 U.S. at 158 ("For more than a century, Congress has afforded the Attorney General (or other executive officials) discretion to allow otherwise removable aliens to remain in the country."). IIRIRA also limited expedited removal to aliens who had been present here for less than two years, 8 U.S.C. § 1225(b)(1)(A)(iii), thereby affording more robust removal processes to aliens who have resided here longer, even though illegally. These examples show that although IIRIRA generally treats entry without admission more severely, it does not do so in every possible respect.

And while it is generally reasonable to think that Congress would want to disincentivize illegal entry, the expedited removal provisions address this concern to a

notable extent. Aliens subject to expedited removal must be mandatorily detained. 8 U.S.C. §§ 1225(b)(1)(A)(iii), (B)(ii), (B)(iii)(IV); 8 C.F.R. § 235.3(b)(2)(iii); *Jennings*, 583 U.S. at 297. The expedited removal process applies to unlawful border entrants when apprehended at the border. *See* 8 U.S.C. § 1225(b)(1)(A)(i), (iii) (applying expedited removal to aliens inadmissible under 8 U.S.C. § 1182(a)(7) for lacking valid entry documents). And the government has the discretion to apply the expedited removal process to aliens who have not been physically present in the United States continuously for two years prior to a determination of inadmissibility. *Id.* § 1225(b)(1)(A)(iii).

So entirely aside from § 1225(b)(2)(A), expedited removal and its associated mandatory detention authorities already cover illegal entrants and subject them to less favorable treatment. The same is true of § 1226(c). Aliens who illegally enter the country may also be subject to criminal prosecution. *See* 8 U.S.C. §§ 1325, 1326. Thus, to the extent there is concern that the traditional understanding of § 1225(b)(2)(A) lowers the costs of illegal entry, the expedited removal and other detention provisions, as well as the criminal prohibitions, address this concern to some degree. Regardless, the Supreme Court has recently confirmed that concerns that an interpretation "will create perverse incentives for aliens to enter the country illegally . . . cannot defeat the best reading of the text." *Al Otro Lado*, 2026 WL 1825741, at \*10.

In short, although the government's appeal to statutory purpose is a plausible one, there are equally plausible reasons why Congress in 1996 may have stopped of short requiring mandatory detention for all unadmitted aliens present in the United States. Arguments from statutory purpose are therefore not conclusive enough to overcome the

textual difficulties associated with the government's new interpretation.

## B

We last consider the post-enactment practice and understanding surrounding IIRIRA's detention authorities. These considerations likewise do not provide additional support for the government's new interpretation. Instead, they detract from it.

As already explained, the government since IIRIRA maintained an unbroken practice of permitting the release on bond of noncriminal aliens detained inside the United States and charged with removability for being present without admission. *See Barbosa da Cunha*, 175 F.4th at 91 ("[T]he government concedes that, for five Presidential administrations over nearly three decades, it did consistently release detainees on bond whom the government now argues are covered by Section 1225(b)(2)(A)."). Only in 2025 did the government change its legal position. At no point during the intervening decades did prior Administrations indicate that the Executive Branch had been violating a detention mandate that the government now describes as "clear." Indeed, as far as we can tell, no one over the course of the last thirty years (until very recently) expressed the view that the government's longstanding approach to the detention of unadmitted aliens present in the United States contravened the statute.

It is true that "[a]uthority actually granted by Congress of course cannot evaporate through lack of administrative exercise." *FTC v. Bunte Brothers, Inc.*, 312 U.S. 349, 352 (1941). And the government is permitted to change its position if the statute so allows. But "just as established practice may shed light on the extent of power conveyed by

general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." *Id.*; *see also Biden*, 600 U.S. at 519 (Barrett, J., concurring). That no Administration "has ever found" a duty mandatorily to detain unadmitted aliens present in the interior of the country "is strong evidence that it does not exist." *Learning Resources*, 607 U.S. at 250; *see also id.* at 245 ("It is also telling that in IEEPA's 'half century of existence,' no President has invoked the statute to impose *any* tariffs—let alone tariffs of this magnitude and scope. . . . The 'lack of historical precedent' for the IEEPA tariffs, 'coupled with the breadth of authority' that the President now claims, 'is a telling indication' that the tariffs extend beyond the President's 'legitimate reach.'" (quoting *NFIB v. Dep't of Lab.*, 595 U.S. 109, 119 (2022))); *Abramski v. United States*, 573 U.S. 169, 202–03 (2014) (Scalia, J., dissenting) ("[T]he fact that the agency charged with enforcing the Act read it, over a period of roughly 25 years, not to apply to the type of conduct at issue here is powerful evidence that interpreting the Act in that way is natural and reasonable . . . .").[3]

Although the government concedes the novelty of its policy, it points to one regulation promulgated in 1997 that

---

[3] The dissent errs in attempting to cast as an exercise of "discretion" the government's approximately thirty years of affording bond hearings to unadmitted aliens present in the interior of the United States. Dissent at 83–85. By the government's new interpretation, there was no such discretion for it to exercise. The language of § 1225(b)(2)(A) is mandatory. *See Jennings*, 583 U.S. at 302. The import of the government's new position is not that it was previously exercising discretion, but rather that it was violating the statute for three decades, without anyone having raised this issue until recently.

arguably reflects the government's current interpretation of § 1225(b)(2)(A). Specifically, 8 C.F.R. § 235.3(b)(1)(ii) provides:

> An alien who was not inspected and admitted or paroled into the United States but who establishes that he or she has been continuously physically present in the United States for the 2-year period immediately prior to the date of determination of inadmissibility shall be detained in accordance with section 235(b)(2) of the Act [8 U.S.C. § 1225(b)(2)] for a proceeding under section 240 of the Act [8 U.S.C. § 1229a].

*See also Buenrostro-Mendez*, 166 F.4th at 507 ("This regulatory provision from 1997 looks no different from the government's interpretation in 2025."). But this sentence is included at the end of a broader provision about expedited removal, which has its own distinct mandatory detention provision, as discussed above. It is thus not apparent whether this regulation was meant to address the question before us. That is underscored by the fact that the government did not follow this interpretation. It instead followed an approach consistent with a different statement in the regulatory record: "*Despite being applicants for admission*, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) *will be eligible for bond* and bond redetermination." 62 Fed. Reg. 10312, 10323 (March 6, 1997) (emphasis added); *see also id.* (stating that "inadmissible aliens, except for arriving aliens, *have available to them bond redetermination hearings*" (emphasis added)).

In short, statements in the regulatory record are at best mixed, but the government's consistent practice over the last thirty years is not.  The dissent therefore errs in suggesting that all we have here is Executive Branch "inactions." Dissent at 83 (brackets omitted).  We have thirty years of action—the government actively treating unadmitted aliens present in the interior of the country as entitled to bond hearings under § 1226(a).  To the extent the dissent asks for further evidence of the Executive Branch embracing the traditional understanding of the relationship between §§ 1225 and 1226, Dissent at 83, the government (beyond the sources we have already cited) stated this same understanding before the Supreme Court in *Jennings*.[4]  If the dissent would ask for even further Executive Branch statements, their absence is, if anything, more indicative of the fact that the traditional understanding of the detention

---

[4] *See* Br. for Pet'rs at 2–4, *Jennings*, 583 U.S. 281 (describing § 1225(b)(2)(A) and its predecessors as reflecting a "longstanding rule" of mandatory detention for "aliens who arrive at our Nation's doorstep," and § 1226 as providing "[a] different framework . . . for the detention and removal of aliens who are already inside the United States"); Supp. Br. for Pet'rs at 4, 12, *Jennings*, 583 U.S. 281 (explaining that "[i]n virtually all cases, Section 1225(b) is applied to aliens seeking initial entry," except that in "unusual circumstances" it can apply to returning lawful permanent residents, but that "Section 1226(a) governs the detention and release of other aliens arrested inside the United States.  8 U.S.C. 1226(a).   This encompasses aliens in a wide variety of circumstances, including those who are present after entering illegally[.]"); Transcript of Oral Argument at 12, *Jennings*, 583 U.S. 281 (Oct. 3, 2017) (on reargument) ("Sections 1225 and 1226 have traditionally been understood to get at different categories of aliens. 1226 is the provision that we use when we arrest somebody who is within the -- who has entered the United States -- or is within the United States; 1225 is the one we use when we are dealing with aliens who arrive at our shores."); *see also* Transcript of Oral Argument at 7–8, *Jennings*, 583 U.S. 281 (Nov. 30, 2016).

regime was so well-accepted. That the government for decades did not exercise the new power it asserts is therefore both "strong evidence that it does not exist," *Learning Resources*, 607 U.S. at 250, and at minimum does not help the government in overcoming the textual and interpretive problems with its current interpretation.

Meanwhile, over the course of the nearly thirty years that the government allowed for aliens like the plaintiffs to receive bond hearings, Congress amended the INA on various occasions. *See, e.g.*, Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, tit. II, 111 Stat. 2193 (1997); USA PATRIOT Act, Pub. L. No. 107-56, §§ 411–12, 115 Stat. 272, 345–52 (2001); REAL ID Act, Pub. L. No. 109-13, div. B, 119 Stat. 302 (2005); Trafficking Victims Protection Reauthorization Act, Pub. L. No. 110-457, § 235, 122 Stat. 5044, 5074–82 (2008). On none of those occasions did Congress clarify that the Executive Branch had been avoiding its statutory obligation to detain the large number of aliens present inside the country without admission. And the Laken Riley Act, as we have discussed, ordered the mandatory detention of aliens who would already be subject to that form of detention under the government's new interpretation of § 1225(b)(2)(A).

The dissent suggests that our interpretation fails to account for "how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." Dissent at 85 (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 33 (2012)). But there is no need to speculate about what such a reader would have understood in 1996. As explained above, every reliable indicator of congressional, executive, and judicial understanding from IIRIRA's enactment until 2025 reflects the same view: unadmitted aliens apprehended in the

Case: 25-6842, 07/30/2026, DktEntry: 87.1, (67 of 99)

interior remained eligible for release on bond pending removal proceedings. This historical understanding of the relationship between § 1225(b)(2)(A) and § 1226 is further evidence that the text both readily bears, and more probably supports, our interpretation.

## IV

Especially in the context of a complicated statute like the INA, statutory interpretation does not always yield a crystal-clear answer. In those instances, the correct interpretation is the better one, even if both positions have shortcomings. In this case, the better and more natural interpretation of the text, considered in context, is that Congress in 1996 did what practice and precedent long understood it to have done: subject unadmitted aliens entering the United States at the border to § 1225(b)(2)(A), and unadmitted aliens present in the interior of the country to § 1226. The judgment of the district court is

**AFFIRMED.**

BEA, Circuit Judge, Dissenting:

Much of what I write here in dissent has been said before in the opinions and dissents of the five Circuit Courts which have decided cases similar to this appeal. Nonetheless, out of respect for the majority, I address their several arguments and explain why I dissent from each of them.

Because I conclude that the text determines that aliens present without admission who are apprehended inside the United States are subject to mandatory detention without bond under § 1225(b)(2)(A), I respectfully dissent.

## I.  Text

As with any question of statutory interpretation, "we start, of course, with the statutory text, and proceed from the understanding that unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (internal citations and quotation marks omitted).

Section 1225(a)(1) states: "An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission."  8 U.S.C. § 1225(a)(1).

Section 1225(b)(2)(A) states: "Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title."  8 U.S.C. § 1225(b)(2)(A).   As the majority has accurately stated, subparagraphs (B) and (C) are not relevant to this case. *See* Maj. Op. at 18.

And Section 1101(a)(13)(A) states: "The terms 'admission' and 'admitted' mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer."  8 U.S.C. § 1101(a)(13)(A).

Plaintiffs assert that they are not properly held under § 1225(b)(2)(A) because, while they are "applicants for admission," they are not "seeking admission."   The

government contends that all "applicants for admission" are necessarily seeking admission, and thus, plaintiffs may be held without bond under § 1225(b)(2)(A).

My thinking proceeds in three steps. First, I accept, as I must, the premise that Congress has "deemed" "[a]n alien present in the United States who has not been admitted" an "applicant for admission." *See* 8 U.S.C. § 1225(a)(1). I must accept this premise because it is Congress's diktat, applicable to all aliens present in the country who have not previously been legally admitted, including all members of the plaintiff class. This even though we would not usually think of an unadmitted alien illegally present in the United States as an applicant for "legal entry"; indeed, the alien has already entered the country illegally and is no longer seeking entry and claims *not* to be seeking legal entry. *See* 8 U.S.C. § 1101(a)(13)(A); *Sturgeon v. Frost*, 587 U.S. 28, 47 (2019) ("The key word here is 'deemed.' That term is used in legal materials to treat (something) as if . . . it were really something else. . . . Legislators (and other drafters) find the word useful when it is necessary to establish a legal fiction, either by deeming something to be what it is not or by deeming something not to be what it is." (internal citation and quotation marks omitted)); *see also Torres v. Barr*, 976 F.3d 918, 928 (9th Cir. 2020) (holding that in § 1225(a)(1), Congress included a "deeming provision, which places some physically-but-not-lawfully present noncitizens into a fictive legal status for purposes of removal proceedings"); *Hernandez Alvarez v. Warden*, 175 F.4th 1258, 1289 (11th Cir. 2026) (Lagoa, J., dissenting) ("The principle is straightforward. When a statute deems 'A' to be 'B,' it places A in the legal posture of B as a matter of law, with the consequences that follow. Otherwise, 'there [is no] need to create a special legal fiction' in the first place." (internal

citation omitted)).  So, deemed an applicant for legal entry he is.

Second, I apply a non-specialized, ordinary meaning to both the phrases "applicant for admission" and "seeking admission" as neither phrase is defined in the statute.  *See Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 277 (2018) ("As usual, our job is to interpret the words consistent with their ordinary meaning . . . at the time Congress enacted the statute." (internal citation omitted)); *Cloer*, 569 U.S. at 376 ("[U]nless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." (internal citations and quotation marks omitted)).

Third and finally, considering the non-specialized meanings of "applicant for admission" and "seeking admission," I ask whether an applicant for admission is someone who is seeking admission.  As several judges before me have noted, an applicant for admission is one who applies for admission, and the ordinary meaning of "apply for admission" is synonymous with "seeking admission." The use of the gerund does not change its meaning. *See, e.g., Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 502 (5th Cir. 2026) ("When a person applies for something, [he is] necessarily seeking it."); *Hernandez Alvarez*, 175 F.4th at 1291 (Lagoa, J., dissenting) ("The ordinary meaning of the two phrases is synonymous—a point the majority concedes."); *Lopez-Campos v. Raycraft*, 175 F.4th 713, 736 (6th Cir. 2026) (Murphy, J., dissenting) ("Under basic interpretive rules, we must give the undefined word 'applicant' its ordinary meaning: one who applies for or seeks. We thus must regard the Petitioners as 'applying for' or 'seeking' admission when we see phrases like 'alien applying for admission' or 'alien seeking admission' in the INA—including in § 1225(b)(2)(A)'s detention provision.").

Thus, I conclude that the government is correct that all those deemed to be "applicants for admission" are necessarily "seeking admission," and plaintiffs may be properly detained without bond under § 1225(b)(2)(A). Again, this is the case even though the aliens in question are already present in the United States and would not traditionally be understood to be seeking legal entry; Congress has deemed them to be applicants for admission, and the Court may not ignore that.

Yet, if there were any ambiguity regarding how § 1225(a)(1) and § 1225(b)(2)(A) should be understood, the other provisions of § 1225 provide yet further proof that an "applicant for admission" is "seeking admission." *See* 8 U.S.C. § 1225(a)(3); 8 U.S.C. § 1225(a)(5).

Section 1225(a)(3) states that "[a]ll aliens (including alien crewmen) who are applicants for admission *or otherwise seeking admission* or readmission to or transit through the United States shall be inspected by immigration officers." 8 U.S.C. § 1225(a)(3) (emphasis added). That the words "or otherwise" set off "applicants for admission" from "seeking admission" demonstrates that Congress denoted applicants for admission as a "subset" of those seeking admission. *Buenrostro-Mendez*, 166 F.4th at 503; *see also Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 535 (2015) ("'Otherwise' means 'in a different way or manner.'" (quoting Webster's Third New International Dictionary 1598 (1971))); *Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 963–64 (11th Cir. 2016) (en banc) (observing that Congress often uses the phrase "or otherwise" to denote a "subset"). An obvious example of an alien seeking admission "otherwise" than as an applicant for admission described in § 1225(a)(1) and § 1252(b)(2)(A) is an alien applying for admission at a U.S.

Embassy or Consulate.  The majority's assertion that "the government's reading of the word 'otherwise' in § 1225(a)(3) is not the only one," does not defeat the argument that it is undoubtedly the simplest and most natural interpretation of the text. *See* Maj. Op. at 41.

For further proof that applicants for admission are persons seeking admission, one need only look to § 1225(a)(5).  It provides that "[a]n *applicant for admission* may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of *the applicant* in *seeking admission* to the United States."  8 U.S.C. § 1225(a)(5) (emphasis added). That provision, too, shows that Congress treated applicants for admission as among those seeking admission.  *See Buenrostro-Mendez*, 166 F.4th at 503 ("Th[e] language [in § 1225(a)(5)] strongly suggests that those who are applicants for admission are 'seeking admission.'"); *Lopez-Campos*, 175 F.4th at 750 (Murphy, J., dissenting) ("This provision implies that an 'applicant for admission" is 'seeking admission' by connecting the two phrases.").  The majority asserts that "the required statement 'under oath' about the alien's 'intended length of stay,' 8 U.S.C. § 1225(a)(5), is a less natural question to pose to an alien who has resided in the United States for many years, and would make more sense posed to an alien at the border."  *See* Maj. Op. at 44. This is unconvincing.  "[A]n immigration officer can ask an unlawfully present alien each of [the] questions [raised in the statute], and the alien can answer them. How long do you intend to stay? Do you intend to remain permanently or become a United States citizen? Are you inadmissible? These questions are perfectly intelligible, and the answers perfectly informative."  *Hernandez Alvarez*, 175 F.4th at 1294 (Lagoa, J., dissenting).  And in any case, "a more

comfortable fit does not allow us to read an exception into § 1225—particularly when Congress provided none." *Id.* at 1295. Indeed, these questions would be relevant preliminarily to the immigration officer informing the alien that he could avoid detention by returning to his country or otherwise leaving the United States, pursuant to § 1225(a)(4).

The plain meaning of the words used in § 1225(b)(2)(A), as well Congress's intertwined usage of the relevant phrases throughout § 1225, support the government's position that an "applicant for admission" is necessarily "seeking admission."

## II. Purpose

This straightforward textual interpretation meshes with the purpose of the statute. As the majority recognizes, our en banc panel before us has already considered the context of IIRIRA's enactment and has determined its purpose: to "ensure[] that all immigrants who have not been lawfully admitted, regardless of their physical presence in the country, are placed on equal footing in removal proceedings under the INA—in the position of an 'applicant for admission.'" *Torres*, 976 F.3d at 928.[1]

---

[1] The majority asserts that the en banc panel in *Torres* relied in part on legislative history to ascertain IIRIRA's purpose, but it does not suggest that *Torres*'s conclusion about IIRIRA's purpose is not binding on this panel. *See United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) ("[W]here a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense."); *see also infra* at 86–90.

Indeed, under the pre-IIRIRA regime, when and where an alien encountered immigration officials mattered significantly, because deportation proceedings of aliens who had successfully sneaked into the country were more favorable to the illegal alien than were exclusion proceedings applicable to aliens apprehended at the border. As the en banc panel explained it, the "distinction between those who had entered the United States and those who had not was important," in that "'[aliens] who had entered without inspection could take advantage of the greater procedural and substantive rights afforded in deportation proceedings, while [aliens] who presented themselves at a port of entry for inspection were subjected to more summary exclusion proceedings.'" *Torres*, 976 F.3d at 927–28 (quoting *Hing Sum v. Holder*, 602 F.3d 1092, 1100 (9th Cir. 2010)); *see Mullin v. Al Otro Lado*, 609 U. S. ____ (2026) (Sotomayor, J., dissenting) ("One incongruity in [the pre-IIRIRA] system was that deportation proceedings conferred greater procedural protections than exclusion proceedings, which benefited [aliens] who entered illegally without inspection compared to those who showed up legally at ports of entry."); *see also Landon v. Plasencia*, 459 U.S. 21, 26 (1982) (summarizing the differences between deportation and exclusion proceedings); *Maldonado-Sandoval v. U.S. Immigr. & Naturalization Serv.*, 518 F.2d 278, 280 n.3 (9th Cir. 1975) (same).

The upshot was that prior to 1996, our immigration laws "created an anomaly whereby immigrants who were attempting to lawfully enter the United States were in a worse position than persons who had crossed the border unlawfully." *Torres*, 976 F.3d at 928.

Congress in IIRIRA sought to "address[] this anomaly." *Hing Sum*, 602 F.3d at 1100. Among other changes, IIRIRA

eliminated the concept of "entry" as the basis for determining the immigration processes to which an alien would be subject. *Torres*, 976 F.3d at 928. In its place, Congress substituted the concept of "admission," defined as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). Congress also eliminated the distinction between deportation and exclusion proceedings and replaced them with a singular "removal" proceeding. *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216, 223 (BIA 2025); *see* 8 U.S.C. § 1229a. As stated above, through these changes, IIRIRA "ensures that all immigrants who have not been lawfully admitted, regardless of their physical presence in the country, are placed on equal footing in removal proceedings under the INA." *Torres*, 976 F.3d at 928; *see also Mullin*, 609 U. S. \_\_\_\_ (2026) (Sotomayor, J., dissenting) ("IIRIRA was designed to ensure that noncitizens who have entered the United States without inspection do not gain equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection at a port of entry" (internal quotation marks and citation omitted)).

We have previously "refuse[d] to interpret the INA in a way" that "'create[s] a perverse incentive to enter at an unlawful rather than a lawful location,'" because "this was the precise situation that Congress intended to do away with by enacting [IIRIRA]." *United States v. Gambino-Ruiz*, 91 F.4th 981, 990 (9th Cir. 2024) (quoting *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 140 (2020)). Indeed, it is not readily conceivable that the Congress that enacted IIRIRA, a law that clearly endeavored to strengthen our nation's immigration laws against illegal entrants, would have wanted to give preferential bond treatment to those

aliens who had entered this country without permission and had managed to avoid detection. *Buenrostro-Mendez*, 166 F.4th at 508 ("It seems strange to suggest that Congress would have preserved bond hearings exclusively for unlawful entrants.").

And yet the majority asserts that despite Congress's attempt to place those who lawfully present themselves at the border and those who enter illegally "on equal footing in removal proceedings," Congress also intended to allow aliens who entered illegally to be released on bond into the country during their immigration proceedings, while denying bond to those who lawfully presented themselves at the border.

That does not sound at all like "equal footing" to me. Those released on bond are permitted to live within the United States often for several years before removal proceedings are finalized, and that is only after they have been apprehended.[2] *See INS v. Rios-Pineda*, 471 U.S. 444,

---

[2] Bond is set at a minimum of just $1,500. 8 U.S.C. § 1226(a)(2)(A). In considering whether an alien merits release on bond, as well as the amount of bond that is appropriate, immigration judges consider the following factors:

> (1) whether the alien has a fixed address in the United States; (2) the alien's length of residence in the United States; (3) the alien's family ties in the United States, and whether they may entitle the alien to reside permanently in the United States in the future; (4) the alien's employment history; (5) the alien's record of appearance in court; (6) the alien's criminal record, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses; (7) the alien's history of immigration violations; (8) any attempts by the alien to flee

450 (1985) ("One illegally present in the United States who wishes to remain . . . has a substantial incentive to prolong litigation in order to delay physical deportation for as long as possible."); David Hausman & Jayashri Srikantiah, *Time, Due Process, and Representation: An Empirical and Legal Analysis of Continuances in Immigration Court*, 84 Fordham L. Rev. 1823, 1824–25 (2016) ("The slowest-moving cases in immigration courts . . . are those of individuals who are not detained and not on a priority docket. Those cases regularly last several years."); Donald Kerwin & Evin Millet, *The US Immigration Courts, Dumping Ground for the Nation's Systemic Immigration Failures: The Causes, Composition, and Politically Difficult Solutions to the Court Backlog*, 11 J. Migration & Hum. Sec. 107 (2023) ("EOIR reports that as of March 10, 2023, there were: 731,149 cases in removal proceedings that had been pending for at least three years and 277,412 pending for at least five years."). These long delays provide yet another benefit to aliens who cross the border illegally: as time passes, community ties strengthen, and families grow, the alien's case for cancellation of removal under 8 U.S.C § 1229b only improves. *Barton v. Barr*, 590 U.S. 222, 245–46 (2020) (Sotomayor, J., dissenting) (noting that "factors such as family ties within the United States, residence of long duration in this country (particularly when the inception of residence occurred at a young age), and business ties all favor [an alien] seeking cancellation [of removal under 8 U.S.C § 1229b]" (internal citation and quotation marks

---

prosecution or otherwise escape from authorities; and (9) the alien's manner of entry to the United States.

*In Re Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006).

omitted)). Those that present themselves lawfully at the border never receive such opportunities.

The majority's interpretation would thus reintroduce the very inequality that *Torres* told us Congress sought to remedy in IIRIRA: that our immigration laws would incongruously privilege those who enter this country illegally and evade detection, as compared to those who responsibly present themselves at ports of entry consistent with legal requirements. Indeed, the majority's view would "read IIRIRA to expand (rather than eliminate) the 'perverse incentive to enter at an unlawful rather than a lawful location' that existed before Congress passed that law." *Lopez-Campos*, 175 F.4th at 755–56 (Murphy, J., dissenting) (quoting *Thuraissigiam*, 591 U.S. at 109); *see also Avila v. Bondi*, 170 F.4th 1128, 1136 (8th Cir. 2026) ("[U]nder Avila's interpretation of the statute, he would be entitled to receive a bond hearing, even though aliens who 'seek[ ] admission' by actively engaging with the legal process would not be. Because this outcome is incongruous and contradicts the statute's goal of placing all aliens 'on equal footing,' it cuts against Avila's reading of the statute." (internal citation omitted)).

The text of § 1225 and the purpose of IIRIRA thus demonstrate that the government is correct: "applicants for admission" may be properly detained under § 1225(b)(2)(A) without bond.

## III. Further Considerations

As both the plain text of § 1225 itself and the purpose of IIRIRA establish that the government may detain without bond aliens present without admission under § 1225(b)(2)(A), the only question left to ask is whether there is any text in another section of IIRIRA or any other

tool of statutory interpretation that would undermine this conclusion. The majority proposes several avenues, none of which are persuasive.

### A. Congress's Clarity

Pervading the majority's opinion is an underlying demand for congressional clarity to authorize mandatory detention of aliens who entered the country illegally. *See, e.g.,* Maj. Op. at 48–49 ("In short, if the statute were departing from prior law and practice and imposing a new mass detention requirement, Congress would have drafted language more direct than what we have in § 1225(b)(2)(A) and the rest of § 1225 . . . The 'oblique' and 'elliptical' language of § 1225(b)(2)(A), *West Virginia v. EPA*, 597 U.S. 697, 723 (2022), does not approach the 'requisite clarity' we would expect if 'Congress wish[ed] to alter the fundamental details' of the mandatory detention scheme. [*United States Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 621 (2020)] (quotations omitted).").

Yet, the standard by which the expected "requisite clarity" ought to be judged is not itself very clear. Under this unbounded standard, a judge can stymie congressional action even when a statute's plain text would allow for the challenged application; this opens the door to judicial legislation, by allowing a judge to claim any text is just short of the clarity he would require.

While the majority is correct that the Supreme Court has employed this heightened standard in recent Major Questions Doctrine cases, many of which the majority cites, as Judge Lagoa made clear, it is doubtful that the doctrine applies to the case at hand. *See Hernandez Alvarez*, 175 F.4th at 1299–1309 (Lagoa, J., dissenting). For one thing, only six members of the current Supreme Court have ever

endorsed the use of the Major Questions Doctrine, *see, e.g., W. Virginia v. Env't Prot. Agency*, 597 U.S. 697 (2022), and of those six, three found the doctrine inapplicable in cases involving foreign affairs, *see Learning Res., Inc. v. Trump*, 607 U.S. 229, 333–34 (2026) (Kavanaugh, J., dissenting) (noting that the Major Questions Doctrine "requires 'clear congressional authorization' for an executive action of major economic and political significance" and asserting that "[i]n foreign affairs cases, courts read the statute as written and do not employ the major questions doctrine as a thumb on the scale against the President.").

The Supreme Court has long recognized that immigration is ineluctably tied to foreign affairs. *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–589 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government.  Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."); *Biden v. Texas*, 597 U.S. 785, 805–06 (2022) ("[T]he Court has taken care to avoid the danger of unwarranted judicial interference in the conduct of foreign policy, and . . . [t]hat is no less true in the context of immigration law, where [t]he dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy" (internal citations and quotation marks omitted)).

Considering also Justice Gorsuch's concurrence in *Learning Resources*, in which he asserted that "the major questions doctrine may speak with less force where the President and Congress enjoy overlap[ping] . . . authority,'"

207 U.S. at 284 (Gorsuch, J., concurring), it appears likely that there would be at most two votes at the Supreme Court for any doctrine that does not simply "read the statute as written" and instead places "a thumb on the scale against the President," *id.* at 334 (Kavanaugh, J., dissenting). I am not inclined to follow the minority.

Not only is a doctrine demanding more congressional clarity ill-fitted to the case at hand because of the foreign affairs dimension, the case also lacks many of the other characteristics of a typical Major Questions Doctrine case. In enforcing immigration laws, the executive is not acting "outside its wheelhouse." *See Biden v. Nebraska*, 600 U.S. 477, 518 (2023) (Barrett, J., concurring); *Hernandez Alvarez*, 175 F.4th at 1308 (Lagoa, J., dissenting) ("If detaining aliens for removal proceedings is not in the immigration enforcement wheelhouse, nothing is."). The text from which the detainment power is derived is not hidden in some "previously little-used [statutory] backwater." *West Virginia*, 597 U.S. at 730; *Hernandez Alvarez*, 175 F.4th at 1308 (Lagoa, J., dissenting) ("[S]ection 1225(b)(2)(A) is the INA's principal mandatory detention authority for applicants for admission. And the deeming provision on which it rests, § 1225(a)(1), is not buried in some 'backwater.' . . . It is the opening line of § 1225.").

And finally, the agency has long recognized that it had the power to detain aliens who are present without having been admitted without bond under § 1225(b)(2)(A). *See West Virginia*, 597 U.S. at 747 (Gorsuch, J., concurring) ("A 'contemporaneous' and long-held Executive Branch interpretation of a statute is entitled to some weight as evidence of the statute's original charge to an agency."). Among other evidence, the 1997 interim rule, which implemented IIRIRA, stated: "*Despite being applicants for*

*admission*, aliens who are present without having been admitted or paroled . . . will be eligible for bond and bond redetermination." Detention and Removal of Aliens, 62 Fed. Reg. 10312, 10323 (March 6, 1997) (codified at 8 C.F.R. pt. 1 et al.) (emphasis added). As Judge Lagoa stated: "The word 'despite' is telling. It concedes that aliens present without admission are, 'applicants for admission,' and frames bond eligibility not as a statutory entitlement, but as an accommodation notwithstanding what the statute would otherwise require." *Hernandez Alvarez*, 175 F.4th at 1307 (Lagoa, J., dissenting).

There is even further evidence of the executive branch's original understanding of IIRIRA. A regulation enacted in 1997 that is still on the books today provides the same interpretation of § 1225(b)(2)(A) for which the government advocates:

> An alien who was not inspected and admitted or paroled into the United States but who establishes that he or she has been continuously physically present in the United States for the 2-year period immediately prior to the date of determination of inadmissibility shall be detained in accordance with section 235(b)(2) of the Act [8 U.S.C. § 1225(b)(2)] for a proceeding under section 240 of the Act [8 U.S.C. § 1229a].

8 C.F.R. § 235.3(b)(1)(ii). Aliens who are "applicants for admission" by virtue of being "present in the United States" without admission are plainly subject to § 1225(b)(2)(A) under this regulation. *See also Buenrostro-Mendez*, 166

F.4th at 507 ("This regulatory provision from 1997 looks no different from the government's interpretation in 2025.").

That the executive branch had until this point exercised its discretion in deciding not to detain aliens present without admission under § 1225(b)(2)(A) is irrelevant. Such previous governmental practice does nothing to change the text of the statute. The majority asserts that the executive has "traditionally understood" § 1252(b)(2)(A) as applying only to aliens at the border; for evidence, the majority relies largely on the executive's prior practice of not detaining illegal aliens within the country under § 1252(b)(2)(A).[3] Its conclusion is therefore apparently based on the homely nostrum, a bit modified: "[In]actions speak louder than [the] words [of the statute]."

But, as the majority concedes, the "[a]uthority actually granted by Congress of course cannot evaporate through lack of administrative exercise." Maj. Op. at 62 (quoting *FTC v. Bunte Brothers, Inc.*, 312 U.S. 349, 352 (1941)); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 329 (2015) ("[A] 'long-established practice' does not justify a rule that denies statutory text its fairest reading."); *Buenrostro-Mendez*, 166 F.4th at 506 ("The text says what it says, regardless of the decisions of prior

---

[3] The majority also cites the government's briefing and oral argument in the 2018 Supreme Court case, *Jennings v. Rodriguez*, 583 U.S. 281 (2018). *See* Maj. Op. at 65–66. The majority's quotes from that briefing and argument make clear only that at that time, the government relied on § 1226(a) when detaining illegal aliens within the country and on § 1225(b)(2)(A) when detaining those at the border. This recitation of past usage was not a comment on the meaning of the text of §§ 1225 and 1226 and was certainly not a concession that § 1225(b)(2)(A) could not be used to detain aliens present within the country. Therefore, its probative value regarding the question in this case is limited.

Administrations."); *Hernandez Alvarez,* 175 F.4th at 1307 (Lagoa, J., dissenting) ("That the Executive long preferred flexibility over rigidity is not evidence that the mandatory authority was never conferred."); *Lopez-Campos*, 175 F.4th at 758 (Murphy, J., dissenting) ("[T]he Court did not hesitate to reject what had been the decades-old agency and judicial view of Title VII when it held that the text unambiguously covered sexual-orientation discrimination [in *Bostock v. Clayton County*]"); *Bob Jones Univ. v. United States*, 461 U.S. 574, 595 (1983) ("That [a change in the executive's interpretation of a statute] may be seen as belated does not undermine its soundness."); *c.f. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024) ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority . . . [and] courts need not and under the APA may not defer to an agency interpretation of the law.").

As political winds change and the resources available to the executive branch change with them, so do executive priorities. *See United States v. Morton Salt Co.*, 338 U.S. 632, 647–48 (1950) ("We know that unquestioned powers are sometimes unexercised from lack of funds, motives of expediency, or the competition of more immediately important concerns."); *see, e.g., Sherman Antitrust Act*, Encyclopedia Britannica, https://www.britannica.com/event/Sherman-Antitrust-Act ("The first vigorous enforcement of the [1890] Sherman Act occurred during the administration of U.S. Pres. Theodore Roosevelt (1901-1909)"); Joseph W. Yockey, *Choosing Governance in the FCPA Reform Debate*, 38 J. Corp. L. 325, 326 (2013) (noting that while the Foreign Corrupt Practices Act was adopted in 1977, it lay "[m]ostly dormant for its first 25 years" due in part to primitive resolution tools and

concerns that American companies would be disadvantaged as compared to international competitors); *Bob Jones University*, 461 U.S. at 579, 595 (where the Court upheld the Internal Revenue Service's new interpretation of 26 U.S.C. § 501(c)(3) of the Internal Revenue Code of 1954 such that any organization practicing racial discrimination could not be considered a "charitable organization" and thus could not be considered "exempt from taxation" under the statute, even though the executive, based on political will, had never exercised its authority in such a manner and such organizations had always been considered worthy of § 501(c)(3) status). The language of a statute and what it permits, however, is unaffected by such exercises of executive discretion and interpretation.

Thus, having dismissed the potential bases for applying a standard that would require heightened congressional clarity, I see no reason to suggest that the Court should depart from its usual task, which is to "determin[e] the application of [the] governing text to the given facts on the basis of how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 33 (2012). No heightened standard of clarity is required or appropriate. *See Learning Resources, Inc.*, 607 U.S. at 333–34 (Kavanaugh, J., dissenting).

Still, whether this heightened demand for an untold level of clarity applies here is irrelevant in any case, because, as I hope to have laid out above, the text is indeed clear. One can ask why Congress did not arrange its words in a more pleasing manner or why Congress did not use an exclamation point to confirm its intended action. But a fair reading of the text leads to only one conclusion: § 1225(a)(1)

deems plaintiffs to be applicants for admission, and § 1225(b)(2)(A) states that applicants for admission (who, by their congressionally deemed status, are necessarily seeking admission) can be held without bond. The statute's purpose further confirms this interpretation.

B.  Torres v. Barr

In *Torres v. Barr*, the Ninth Circuit held that although an alien was an "applicant for admission" under § 1225(a)(1), the use of that "term of art" did not mean that the alien had, "at a distinct point in time" submitted an "application of admission" for purposes of 8 U.S.C. § 1182(a)(7). [4]  In discussing the case, our later panel stated: "*Torres* merely rejected the view that an alien remains in a perpetual state of applying for admission." *Gambino-Ruiz*, 91 F.4th at 989. The majority asserts that "if the legal construct 'applicant for admission' does not mean 'an alien remains in a perpetual state of applying for admission' . . . we do not think an alien present in the interior of the United States remains in the perpetual state of seeking admission (that is, seeking *entry*), either." Maj. Op. at 37.  But *Torres* and *Gambino-Ruiz* are readily distinguishable; the "perpetual state of applying for admission" language has no bearing on the outcome of this case.

The facts of *Torres* are as follows.  In 2008, Congress passed the Consolidated Natural Resources Act of 2008, which "imposed U.S. immigration laws, in particular the INA, within the Commonwealth of the Northern Mariana Islands (CNMI) beginning November 28, 2009." *Torres*,

---

[4] Section 1182(a)(7)(A)(i)(I) renders inadmissible "any immigrant at the time of application for admission… who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter…"

976 F.3d at 921–22. The petitioner, a native of the Philippines, had entered CMNI as a guest worker before 2000 and was working there lawfully under previous CMNI law, but with the imposition of the INA, she became removable. *Id.* at 923. Congress enacted a two-year reprieve during which immigrants lawfully present in the CNMI under CNMI law on November 28, 2009 would not be deported under 8 U.S.C. § 1182(a)(6)(A)(i) for not having been admitted or paroled. *Id.* at 922. Nonetheless, in 2010, Petitioner was placed in removal proceedings under § 1182(a)(7)(A)(i)(I) as an alien who lacked a valid entry document "at the time of application for admission." Petitioner challenged her removal on the basis that, because she had not yet submitted an application for admission into the United States, she was not removable under this provision. The IJ ordered her removed, and the BIA affirmed. She appealed. We reversed.

The en banc Court considered § 1182(a)(7)(A)(i)(I), which renders inadmissible: "any immigrant at the time of application for admission . . . who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter." *Id.* The Court's task was to "construe the meaning of the phrase 'at the time of application for admission'" as it appears in § 1182(a)(7)(A)(i)(I). *Torres*, 976 F.3d at 924. The panel noted that the government's interpretation would "render[] a complete nullity" both Congress's two-year reprieve for immigrants lawfully present in the CNMI, and the neighboring § 1182(a)(6). *Id.* at 930. Ultimately, the Court concluded: "Given that an immigrant submits an 'application for admission' at a distinct point in time, stretching the phrase 'at the time of application for

admission' to refer to a period of years would push the statutory text [of § 1182(a)(7)(A)(i)(I)] beyond its breaking point." *Id.* at 926.   Thus, the Court held that § 1182(a)(7)(A)(i)(I) did not apply to the petitioner, because although she was an applicant for admission under § 1225(a)(1), at no point in time during the yet-unexpired two-year reprieve period, had she submitted an application for admission for the purposes of removal under § 1182(a)(7)(A)(i)(I).

In *Gambino-Ruiz*, the Court clarified that the holding in *Torres* was limited to the factual situation in which the petitioner, unlike plaintiffs here, legally entered the country; as the Court stated in *Torres*, the petitioner in that case "never crossed the U.S. border; the border crossed [her]" when the INA was applied to CNMI.  91 F.4th at 989.  In the normal case in which an alien illegally crosses the border and is later apprehended, the Court held that an alien may be deemed for purposes of § 1182(a)(7)(A)(i)(I) to have submitted an "application for admission" at the moment he crossed illegally into the United States and was thereafter apprehended.  *Id.*; *see also* Maj. Op. at 35–37.

As is clear from the above, in neither *Torres* nor *Gambino-Ruiz* did the Court consider § 1225(b)(2)(A).  In neither case did the Court consider the detention of immigrants.  The Court recognized that the deeming clause of § 1225(a)(1) did not "alter[] the meaning of [the] substantive ground of inadmissibility [in § 1182(a)(7)(A)(i)(I)] that refers to the time of a real event: an actual application for admission," but in no way did it purport to state that an "applicant for admission" under § 1225(a)(1) is not "seeking admission" under § 1225(b)(2)(A).  *See Torres*, 976 F.3d at 928.  Neither *Torres* nor *Gambino-Ruiz* stretched so far.  *See Buenrostro-*

*Mendez*, 166 F.4th at 502 n.8. ("*Torres* has nothing to do with the meaning of 'seeking admission' and whether an 'applicant for admission' is necessarily someone 'seeking admission.'").

And, while *Gambino-Ruiz* suggests that an alien may not be considered to be in a "perpetual state of *applying* for admission," it says nothing about an alien being in a state of "*seeking* admission" after submitting a constructive application by entering the country illegally. 91 F.4th at 989 (emphasis added); *see Buenrostro-Mendez*, 166 F.4th at 502 ("It would make no sense to say that as soon as the applicant clicks 'submit' on her application, she is no longer seeking admission, merely because she does not take any further affirmative steps to gain admittance. Instead, she would ordinarily be understood to be seeking admission as long as her application is pending. The same is true here."). That the en banc panel in *Torres* referred to the words "applicant for admission" as a "term of art" does nothing to change this fact. The majority thus seeks to push *Torres* and *Gambino-Ruiz* beyond their holdings to reach an unsupported conclusion.

Furthermore, under the majority's approach, the deeming clause would be rendered a total nullity. The majority would have us believe that Congress "deemed for [the] purposes of [the] chapter" "alien[s] present in the United States who ha[ve] not been admitted" to be "applicants for admission" in § 1225(a)(1) and then meant for that deeming clause to be drained of all substance by the time a reader of the statute reaches § 1225(b)(2)(A). It strains belief that Congress would go to the trouble of "deeming" a group of aliens "applicants for admission" if it did not intend for that group of aliens to assume any of the characteristics of the plain meaning of those words. *See*

*Hernandez Alvarez*, 175 F.4th at 1301 (Lagoa, J., dissenting) ("The question is whether Congress meant what it said in the immediately preceding subsection. That question has a right answer and a wrong answer."); *see also Sturgeon*, 587 U.S. at 51 (holding that "[t]here is no reason [for Congress] to pretend" that something is what it is not through a deeming clause if there are no consequences that result from the legal fiction created). An alien may not revoke the legal effect of Congress's deeming clause simply because he personally claims not to intend to seek "legal entry." *See* 8 U.S.C. § 1101(a)(13)(A).

## C. Surplusage

The majority next argues that "if all applicants for admission are necessarily 'seeking admission' . . . it is unclear why Congress would have included the phrase 'seeking admission' in § 1225(b)(2)(A)." Maj. Op. at 32. This argument also fails to persuade that applicants for admission are not seeking admission.

First of all, the canon against surplusage is not always a checkmate move in statutory interpretation. *See, e.g.*, *Rimini St., Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 346 (2019). In fact, such surplusage is common in statutory text. As the Supreme Court has explained, "redundancies are common in statutory drafting—sometimes in a congressional effort to be doubly sure, sometimes because of congressional inadvertence or lack of foresight, or sometimes simply because of the shortcomings of human communication." *Barton*, 590 U.S. at 239. When "the better overall reading of the statute contains some redundancy," we must adopt that better reading. *Rimini Street, Inc.*, 586 U.S. at 346; *see also Mullin*, 609 U. S. ____ (2026) ("The anti-surplusage canon is not an iron rule . . . [and] it is subordinate

to the cardinal canon that a legislature says in a statute what it means and means in a statute what it says there." (internal citations and quotation marks omitted)).  So it is here.

Any surplusage within § 1225(b)(2)(A) does not allow us to disregard the plain meaning of "applicants for admission" as including those who—as a matter of language, law, and logic—are "seeking admission."  That Congress could have written § 1225(b)(2)(A) differently does not permit us to take two potentially redundant words and pull on that thread to unravel the statutory scheme.

That is especially the case when plaintiffs' reading of § 1225(b)(2)(A) would create its own apparent redundancy. If "seeking admission" refers only to those seeking lawful admission at the border, as plaintiffs claim, then any alien "seeking admission" is necessarily an "applicant for admission," since such aliens will always be "present in the United States" or "arriv[ing] in the United States."  8 U.S.C. § 1225(a)(1).  On plaintiffs' reading, the phrase "in the case of an alien who is an applicant for admission" is seemingly unnecessary.  In these circumstances, when both sides' interpretations could introduce some surplusage, we cannot prioritize a desire to avoid redundancy over the plain text of the statute Congress enacted.

Furthermore, as Judge Murphy explains, the phrase "seeking admission" may well not create any redundancy at all.  *See Lopez-Campos*, 175 F.4th at 741–42 (Murphy, J., dissenting).  Indeed, § 1225(a)(4) states that "[a]n alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States."  8 U.S.C. § 1225(a)(4).  Thus, "immigrants who are here after illegally entering but who seek to

'withdraw' their constructive applications by requesting to 'depart' at the time of the inspection would qualify as 'applicants for admission' who are not 'seeking admission' at that time. . . . Just the opposite: they are seeking to withdraw their applications by departing. The 'seeking admission' phrase clarifies that the government need not detain and start removal proceedings against this group." *Lopez-Campos*, 175 F.4th at 742 (Murphy, J., dissenting). This exception will not apply to members of the plaintiff class unless the member opts for immediate voluntary departure upon his apprehension.

### D. *Examining Immigration Officer*

Next, the majority notes that "although the INA defines 'immigration officer' [as it is found in § 1225(b)(2)(A)] broadly, *see* 8 U.S.C. § 1101(a)(18); 8 C.F.R. § 287.5(c) . . . [t]he word 'examining' more naturally describes a formal examination, something that traditionally occurs at the nation's borders." Maj. Op. at 30–31. While, with respect, I consider this a rather meek justification for the majority's decision, I will provide what seems the obvious response.

As the majority notes, the INA defines "immigration officer" broadly. An ICE agent fits comfortably within the definition of an "examining immigration officer" mentioned in § 1225(b)(2)(A). *See* 8 U.S.C. § 1101(a)(18) (defining "immigration officer" as "any employee or class of employees of the Service or of the United States designated by the Attorney General, individually or by regulation, to perform the functions of an immigration officer specified by this chapter or any section of this title"). When an ICE officer determines that a member of the class that plaintiffs seek to represent (defined as those who "have entered or will enter the United States without inspection") has indeed

entered without inspection, the officer makes the determination that that person is presumptively inadmissible under § 1182(a)(6). *See* 8 U.S.C. § 1182(a)(6) ("An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible.") Having concluded that an alien entered without inspection, the officer must conclude that the alien is not "clearly and beyond a doubt entitled to be admitted" under § 1225(b)(2)(A). *See* 8 U.S.C. § 1225(b)(2)(A); *see also Lopez-Campos*, 175 F.4th at 740 (Murphy, J., dissenting) (describing the same progression). Thus, plaintiffs' argument that there is no "examining immigration officer" in the interior to make the required determination of whether an alien is "clearly and beyond a doubt entitled to be admitted" under 1225(b)(2)(A) patently fails.

The majority seeks artificially to limit the definition of an "examining immigration officer" to someone behind a numbered window, counter or desk, with papers before him, to the exclusion of the ICE agent on the dusty road in Texas or the street corner in the Los Angeles barrio. The text of the statute offers no support for this interpretation.

## E. Section 1226

Finally, the majority argues that upon considering § 1226, "it becomes even more difficult to say that § 1225(b)(2)(A) should be read the government's way." Again, these arguments are unpersuasive.

As the majority notes, § 1226(a) provides that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Aliens detained under § 1226(a) may be released

on bond pending their removal proceedings. 8 U.S.C. § 1226(a)(2). However, § 1226(a) is subject to § 1226(c), which provides that detention is mandatory for aliens who have committed various criminal offenses or who raise terrorism concerns. 8 U.S.C. § 1226(c)(1). The Attorney General may release aliens subject to § 1226(c) only if required for witness protection and only then if the alien is not a danger or a flight risk. 8 U.S.C. § 1226(c)(4).

The majority argues that plaintiffs fall within § 1226(a); this may be true in a general sense, but where § 1225(b)(2)(A) applies, as the more specific provision— limited to "applicants for admission"—it must control over and above § 1226(a)'s general detention scheme, which is not limited to "applicants for admission" and uses instead the general term "aliens," which, of course, includes those who have successfully applied for and been granted admission. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general."). Section 1226 does not undermine or disturb the government's detention authority under § 1225(b)(2)(A).

The majority next argues that by the government's reading of § 1225(b)(2)(A), much of § 1226(a) is superfluous. That is not correct. That § 1225(b)(2)(A) applies to all aliens who are applicants for admission does not render § 1226(a) superfluous. Section 1226(a) remains applicable to the broad range of aliens who were admitted but who later become removable. *See Buenrostro-Mendez*, 166 F.4th at 505. As the Fifth Circuit explained, "Section 1226(a) undeniably does work independent from § 1225(b)(2)(A) because only § 1226(a) applies to admitted aliens who overstay their visas, become deportable on many different grounds, or were admitted erroneously due to fraud

or some other error." *Id.* at 504–05; *see also id.* at 505 n.11; 8 U.S.C. § 1227(a) (listing grounds of removability under the INA); *id.* § 1225(a)(1) (defining as an "applicant for admission" an alien "present in the United States who has *not been admitted*") (emphasis added). Accordingly, § 1226(a) continues to do substantial independent work under the proper interpretation of § 1225(b)(2)(A), in that § 1226(a) is not limited to "applicants for admission," but includes those aliens previously admitted. Furthermore, while the majority argues that the government's interpretation of § 1225(b)(2)(A) minimizes the importance of § 1226(a), that argument loses force when one considers the fact that the majority's interpretation would render a significant portion of § 1225(b)(2)(A) inoperable, by making it inapplicable to "alien[s] present in the United States who ha[ve] not been admitted." *See Yajure Hurtado*, 29 I. & N. Dec. at 222 (explaining that plaintiffs' same position would fail to give full effect to § 1225(b)(2)(A)).

In addition, § 1226(c)'s detention mandate for certain criminal aliens does not change matters. Section 1226(c) continues to operate in contexts that § 1225(b)(2)(A) does not by mandating detention of aliens who were previously admitted but later become removable on certain criminal grounds. *See* 8 U.S.C. § 1226(c)(1)(B)–(C); *Buenrostro-Mendez*, 166 F.4th at 505 (observing that § 1226(c)(1)(B)–(C) "sweep[s] in deportable aliens in addition to the inadmissible aliens covered by § 1225(b)(2)(A)"). Additionally, unlike § 1225(b)(2)(A), § 1226(c) disallows the possibility of parole for aliens detained under that subparagraph, another important difference. *Buenrostro-Mendez*, 166 F.4th at 505; *Avila*, 170 F.4th 1137; *see* 8 U.S.C. § 1226(c)(4). That is also true of aliens subject to

§ 1226(c)(1)(E), which was added by the Laken Riley Act. *See Buenrostro-Mendez*, 166 F.4th at 505.

It may be the case that 8 U.S.C. § 1226(c)(1)(A)[5] and § 1226(c)(1)(E) do overlap with § 1225(b)(2)(A) under the government's interpretation (although the availability of parole under the latter remains a key difference). But these overlaps once again cannot be the basis for disregarding the plain language of § 1225(b)(2)(A), given Congress's ability to use a "belt-and-suspenders" approach. *See Atl. Richfield Co. v. Christian*, 590 U.S. 1, 14 n.5 (2020); *see also Barton*, 590 U.S. at 239; *Rimini Street, Inc.*, 586 U.S. at 346. And a "belt-and-suspenders" approach makes some sense, considering that the overlap concerns criminal aliens, for whom Congress has displayed special concern.

And as to the Laken Riley Act amendments under § 1226(c)(1)(E) in particular, any presumption against surplusage is substantially weakened by the fact that Congress passed that Act in 2025, against the backdrop of longstanding nonenforcement of § 1225(b)(2)(A) to the class of aliens relevant to this case. When Congress passed the Laken Riley Act, it immediately had a significant effect, given the government's then-approach to § 1225(b)(2)(A). *See Buenrostro-Mendez*, 166 F.4th at 505. The Act's effects are lessened now only as a result of the government's new enforcement practices under § 1225(b)(2)(A). That is not a situation in which a strong-form presumption against surplusage is warranted. And although the majority views the 2025 Congress as having ratified the plaintiffs'

---

[5] Section 1226(c)(1)(A) states that "[t]he Attorney General shall take into custody any alien who . . . is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title," which covers "criminal and related grounds."

interpretation of § 1225(b)(2)(A), it is well-established that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 520 (1992) (quoting *United States v. Price*, 361 U.S. 304, 313 (1960)).

In any case, plaintiffs' own account of §§ 1225 and 1226 also introduces some redundancy. As the majority notes, the Attorney General can extend the expedited removal process to unadmitted aliens inside the United States with fewer than two years of continuous presence, when those aliens are inadmissible for lacking valid entry documents, 8 U.S.C. § 1182(a)(7), or for committing various forms of immigration fraud, *id.* § 1182(a)(6)(C). *See* 8 U.S.C. § 1225(b)(1)(A)(i), (iii); Maj. Op. at 17–18. Aliens subject to expedited removal proceedings are also subject to mandatory detention. 8 U.S.C. § 1225(b)(1)(B)(ii), (iii)(IV). Thus, both § 1225(b)(1) and § 1226(a) facially cover detention of that class of aliens. The same is true of aliens that plaintiffs concede are covered by § 1225(b)(2)(A) who are seeking lawful admission at the border—they too would otherwise be covered by § 1226(a). So even on the plaintiffs' reading, there are aliens subject to § 1225(b) who otherwise fall within § 1226(a).

Additionally, even under the plaintiffs' view of the statute, aliens will at times be subject to overlapping mandatory detention authorities. By the plaintiffs' reading of § 1225(b)(2)(A), aliens who are subject to removal on the inadmissibility grounds in § 1226(c)(1)(A) and (D)[6] would

---

[6] Section 1226(c)(1)(D) states that "[t]he Attorney General shall take into custody any alien who . . . is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title," which cover "terrorist activities."

also be subject to § 1225(b)(2)(A) if they are seeking lawful entry at the border.  And again assuming the plaintiffs' reading, those aliens inside the United States who are inadmissible under § 1182(a)(6)(C) and subject to detention under § 1226(c)(1)(E) may also be subject to detention under § 1225(b)(1), if they meet the continuous presence requirements for expedited removal.  The bottom line is that the INA's detention authorities overlap under any interpretation of the statute offered in this case.  The mere overlap should have no effect on the applicability of the overlapping statutes.

Finally, the majority points to the fact that Congress gave the Attorney General discretion to delay implementation of § 1226(c)'s detention mandate to alleviate detention capacity constraints.  *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Div. C, § 303(b)(2), 110 Stat. 3009–586.  From this the majority argues that, if the government's interpretation of § 1225(b)(2)(A) is correct, Congress would have also delayed implementation of that provision as well, given that the number of aliens subject to § 1225(b)(2)(A) is considerably larger than that subject to § 1226(c), raising even more severe concerns about detention capacity.

This argument invites undue speculation as to what Congress would have done and why it would have done so. Although the plaintiffs would have us infer from the delay in implementation Congress's understanding of the statutory text, the delay could also reflect Congress's understanding of the executive's then-intended enforcement agenda.  As the Fifth Circuit stated, "Congress could have declined to delay implementation of § 1225(b)(2)(A) for any number of reasons." *Buenrostro-Mendez*, 166 F.4th at 507–08; *see also Avila*, 170 F.4th at 1137–38 (rejecting this same argument).

Congress may have been more concerned with detention capacity for those aliens subject to § 1226(c) because they could require greater security measures given their criminal histories. Or Congress could have believed that detention capacity was a greater concern for § 1226(c) detainees because the government would be more likely to exercise its enforcement discretion to detain them. Whatever the reason, we cannot read into Congress's decision to delay implementation of § 1226(c) any counter-textual subjective intent about the scope of § 1225(b)(2)(A).

When considered both individually and as a whole, the majority's arguments regarding § 1226 cannot overcome the plain text of § 1225(b)(2)(A).

## IV. Conclusion

Because I conclude that the text dictates that aliens present without admission who are apprehended inside the United States are subject to mandatory detention without bond under § 1225(b)(2)(A), I respectfully dissent.